BARTRON et al.
v.
DELAWARE RIVER JOINT TOLL BRIDGE COMMISSION.
Civ. A. No. 960–53.

United States District Court,
D. New Jersey.
March 22, 1954.

338

Mackerley & Friedman, by Peter Friedman, Newton, N. J., for plaintiffs; Everett Kent, Bangor, Pa., S. Maxwell Flitter, Easton, Pa., Isadore Glauberman, Jersey City, N. J., of counsel.

John H. Pursel, Phillipburg, N. J., and Herbert W. Backes, Trenton, N. J., for defendant; J. Lawrence Davis, Everett Kent, Bangor, Pa., Mitchell & Pershing, New York City, by Robie L. Mitchell, New York City, of counsel.

FORMAN, Chief Judge.

In the amended complaint and amendment thereof filed herein the plaintiffs, Arthur D. and Katherine Bartron and Nicholas or Nick Ronca of the County of Northampton, Pennsylvania, allege, among other things, that they reside in the vicinage of the bridge which crosses the Delaware River between the Village of Delaware in Warren County, New Jersey and the Township of Upper Mt. Bethel, Northampton County, Pennsylvania, (designated hereinafter as the Bridge) and that they and thousands of citizens residing in their vicinage use the said Bridge to carry on their normal duties "necessary for daily pursuits".

The complaint states further that the defendant, Delaware River Joint Toll Bridge Commission, was created a body

politic by acts of the legislatures of New Jersey and Pennsylvania for the purpose, among others, of freeing the bridges under its jurisdiction when the indebtedness for the construction thereof were liquidated by imposition of tolls and that the Bridge in question in this suit is owned by it and under its jurisdiction; that the said Bridge has been free of the collection of tolls since February 17, 1932 and was traversed by 2,012,076 vehicles in the year 1952 and that defendant has stated that the said Bridge is to be closed and demolished so that plaintiffs and other users will be deprived of it and compelled to cross the River on another bridge owned by defendant on which tolls are charged.

The complaint further charges that the plaintiffs and many others have purchased property and created businesses in the immediate vicinity of the Bridge on the basis that it would continue to function as a free bridge; that as a result of the closing and demolition of the Bridge the businesses and occupations of plaintiffs and others in the vicinage would be substantially injured and their properties depreciated in violation of their constitutional rights not to be deprived of their property without due process of law, not to be discriminated against and not to be denied the equal protection of the laws.

It is further charged that the defendant has no power or authority to close or demolish the Bridge but that it is its legal duty to maintain it at its present location.

The plaintiffs prayed for a temporary and permanent injunction to restrain defendant from closing or demolishing the Bridge.

An order was issued based upon the complaint and supporting affidavits directing the defendant to show cause why the application of plaintiffs for the relief for which they prayed should not be granted.

On the return day thereof the defendant appeared and responded to the application of the plaintiffs. It was agreed by the parties that since the issues were not factual but legal questions, and it being stipulated that the defendant would file an answer to the amended complaint as amended, the case was heard as if on final hearing.

Argument was made by counsel for the respective parties and briefs were filed.

In 1912 and 1913 the legislatures of the State of New Jersey and the Commonwealth of Pennsylvania respectively passed laws [1] in which a joint commission was created for the purpose of acquiring toll bridges over the Delaware River between New Jersey and Pennsylvania located north of the Stone Arch Bridge at Trenton. Provision was made for the payment of purchase prices and condemnation judgments of such bridges up to $500,000 to be contributed by each state to be spent at a rate not greater than $100,000 of each state's contribution in each year. In each of said statutes, it was further provided that immediately upon the acquisition of the toll bridges by the commission the toll charges thereon should cease and the bridges should be free to the traveling public under such laws of the respective States and rules and regulations of the joint commission as may be prescribed.

Subsequent acts of the legislatures of Pennsylvania and New Jersey implement the administration of the objectives of the commission.

In 1927 and 1928 the Pennsylvania and New Jersey Legislatures in supplemental enactments,[2] designated it as the "Joint Commission" and gave it additional powers over and above those originally granted to "provide for the construction and maintenance of free bridges across the Delaware river * * *." N.J. S.A. 32:11–1.

In 1931 the legislature of Pennsylvania enacted a statute providing for

1. N.J. Laws of 1912, c. 297, N.J.S.A. 32:9–1 et seq. Pa. Act of July 25, 1913, P.L. 1277.

2. Pa. Act of May 10, 1927, P.L. 863, 36 P.S. § 3391 et seq. N.J. Laws 1928, c. 217, N.J.S.A. 32:11–1 et seq.

joint action by the Commonwealth of Pennsylvania and the State of New Jersey in the administration, operation and maintenance of bridges over the Delaware River, and for the construction of additional bridge facilities across said River; authorizing the Governor for these purposes to enter into an agreement with the State of New Jersey; creating a Delaware River Joint Toll Bridge Commission and specifying the powers and duties thereof, including the power to finance the construction of additional bridges by the issuance of revenue bonds to be redeemed from revenues derived from tolls collected at such bridges; transferring to said Commission all powers now exercised by the existing commission created to acquire toll bridges over the Delaware River; and making an appropriation for administrative purposes of the proposed commission.[3] It was not until nearly three years later that the New Jersey Legislature adopted a law meeting the objectives of the Pennsylvania Legislation. By its Act of June 11, 1934,[4] however, it passed a statute which contained substantially the same provisions as the Pennsylvania law.

On December 18 and 19, 1934 respectively, the Governors of each state executed the Agreement proposed by the enactments of their Legislatures.

On August 30, 1935, the Congress of the United States passed an act reciting, and giving consent to, the terms of the said Agreement.[5]

The reasons for the Agreement between the states is evidenced in the introductory clauses of their respective enactments authorizing the execution of the Agreement of 1934. The language of each is identical except as it names the other State and the description of its legislation, so we may consider the New Jersey enactment as representative of both States in the following expression:

"Whereas, The commission on behalf of the state of New Jersey, existing by virtue of the provisions of the act approved the first day of April, one thousand nine hundred and twelve (chapter two hundred and ninety-seven), and its supplements and amendments thereto, and the commission on behalf of the commonwealth of Pennsylvania, existing by virtue of the act approved the eighth day of May, one thousand nine hundred and nineteen (pamphlet laws one hundred forty-eight), and its supplements and amendments thereto, acting as a point commission, have acquired various toll bridges over the Delaware river between the state of New Jersey and the commonwealth of Pennsylvania; and

"Whereas, Additional bridge facilities between the two states will be required in the future for the accommodation of the public and the development of both states; and

"Whereas, Such additional bridge facilities should be developed without the expenditure of large sums from the public revenues; and

"Whereas, It is highly desirable that there be a single agency for both states empowered to further the transportation interests of these states with respect to that part of the Delaware river north of the stone arch bridge of the Pennsylvania Railroad from Trenton to Morrisville; now, therefore, * *." N.J. Laws of 1934, c. 215, pp. 498–499. N.J.S.A. 32:8–1.

Thereafter on June 13, 1947 the legislatures of the States of New Jersey and Pennsylvania enacted statutes[6] respectively authorizing the Governors of both States to enter into a Supplemental Agreement to the Agreement of 1934.

---

3. Pa. Act of June 25, 1931, P.L. 1352, amended August 5, 1932, P.L. 23 and May 18, 1933, P.L. 827, 36 P.S. § 3401.

4. N.J. Laws of 1934, c. 215, N.J.S.A. 32:8–1 et seq.

5. 49 Stat. 1051, at 1058.

6. N.J. Laws of 1947, c. 283, N.J.S.A. 32:8–10; Pa. Act of June 13, 1947, P.L. 592, 36 P.S.Pa. § 3401.

The Supplemental Agreement so authorized was executed by the Governor of New Jersey on July 3, 1947 and by the Governor of Pennsylvania on July 8, 1947.

On August 4, 1947, the terms of the said Supplemental Agreement were recited and consent was given thereto in a statute enacted by the Congress of the United States.[7]

Again the preamble of the legislation authorizing the execution of the Supplemental Agreement discloses its purposes in the following language, as contained in the New Jersey statute, substantially identical with that used by the Pennsylvania Act:

"'1. That the Governor is hereby authorized to enter into a supplemental compact or agreement, on behalf of the State of New Jersey, with the Commonwealth of Pennsylvania, amending the Agreement entitled "Agreement between the Commonwealth of Pennsylvania and the State of New Jersey Creating the Delaware River Joint Toll Bridge Commission as a Body Corporate and Politic and Defining Its Powers and Duties," which was executed on behalf of the State of New Jersey by its Governor on the eighteenth day of December, one thousand nine hundred and thirty-four, and on behalf of the Commonwealth of Pennsylvania by its Governor on the nineteenth day of December, one thousand nine hundred and thirty-four, such supplemental compact or agreement to be in substantially the following form;

"' "Supplemental agreement between the Commonwealth of Pennsylvania and the State of New Jersey amending the Agreement entitled 'Agreement between the Commonwealth of Pennsylvania and the State of New Jersey Creating the Delaware River Joint Toll Bridge Commission as a Body Corporate and Politic and Defining Its Powers

and Duties,' by extending the jurisdiction, powers and duties of the commission and defining such additional jurisdiction, powers and duties."

"'Whereas, The Delaware River Joint Toll Bridge Commission (hereinafter referred to as the "commission") was created by a compact or agreement entitled "Agreement between the Commonwealth of Pennsylvania and the State of New Jersey creating the Delaware River Joint Toll Bridge Commission as a body corporate and politic and defining its powers and duties," executed on behalf of the Commonwealth of Pennsylvania by its Governor on the nineteenth day of December, one thousand nine hundred and thirty-four * * * and under the provisions of which compact or agreement the commission was authorized to administer, maintain and operate certain bridges over the Delaware river and now maintains and operates the same as joint State-owned free bridges; and

"'Whereas, Because of the great increase in traffic and loads over said bridges since their construction, many of said bridges are now inadequate or unsafe, and it will be necessary to rehabilitate or replace some or all of said bridges with new bridges at the same or different locations in order to provide safe, adequate and convenient facilities for traffic crossing the Delaware river; and

"'Whereas, It is necessary that the commission have power to issue and sell its bridge revenue bonds for rehabilitating or replacing existing bridges with new bridges at the same or different locations, for acquiring or constructing additional bridges, and for refunding any bridge revenue bonds of the commission, and that the commission

7. 61 Stat. 752.

also have power to fix, charge and collect tolls, rates, rents and other charges for the use of any such new bridge or bridges; now, therefore; * * *.'" N.J. Laws of 1947, c. 283, pp. 990–992, N.J.S.A. 32:8–10 note.

Provisions for further supplements to the Agreement of 1934 were enacted by the Legislature of New Jersey in 1951 and 1952.[8] Also in 1952 the New Jersey Legislature passed an Act[9] authorizing the disposition of certain property by the Commission subject to the approval of the State Highway Commissioner and providing for the proceeds thereof to be paid into the Treasury of the State of New Jersey. Finally on December 21, 1953 a concurrent resolution[10] passed the Senate and Assembly of the New Jersey Legislature requesting the Attorney General of New Jersey to sue in the Superior Court of that State to enjoin the Commission from closing or demolishing the bridge under suit here.

Since the passage of the initial legislation in 1912 and 1913 the original joint commission and its legislative successors acquired and operated 16 bridges freed of tolls and have constructed and operate five toll bridges.[11]

The Bridge in this suit was built in 1890 for railway purposes by the Delaware, Lackawanna and Western Railroad Company. In 1914 it was sold to a private owner and converted into a vehicular toll bridge. In 1932 it was purchased by the joint commission for $275,000 and has been maintained and operated as a free bridge since its said acquisition.

On November 1, 1949 the defendant, the Delaware River Joint Toll Bridge Commission (hereinafter called the Commission) entered into a Trust Indenture with the First-Mechanics National Bank of Trenton, as Trustee, for the issuance of Series A Revenue Bonds in the aggregate amount of $14,500,000. Thereafter under the said Trust Indenture the Commission issued Series B Bridge Revenue Bonds in the amount of $15,-000,000 to pay the cost of three additional bridges, namely, one between Milford, Pennsylvania, and Montague, New Jersey, to replace the existing Milford-Montague Bridge; another between Portland, Pennsylvania and Columbia, New Jersey to replace an existing covered bridge close by and the existing Upper Mt. Bethel-Delaware Bridge (the Bridge in suit here) approximately two miles to the south; and a third bridge at the Delaware Water Gap. In its resolution authorizing the issuance of the Series B bonds the Commission determined

" * * * that said Additional Bridges at said locations will be adequate and convenient for the traffic to be served thereby and will

8. N.J. Laws of 1951, c. 284, N.J.S.A. 32:8–11 et seq.; N.J. Laws of 1952, c. 333, N.J.S.A. 32:8–2 et seq.

9. N.J. Laws of 1952, c. 219, N.J.S.A. 32:9A–1.

10. N.J. Laws of 1953, Senate Concurrent Resolution No. 2.

11. Following is a list of the free and toll bridges, with the year of acquisition:

### Free Bridges

| | | |
|---|---|---|
| 1. | New Hope-Lambertville | 1919 |
| 2. | Point Pleasant-Byran | 1919 |
| 3. | Easton-Phillipsburg | 1921 |
| 4. | Yardley-Wilburtha | 1922 |
| 5. | Washington's Crossing | 1922 |
| 6. | Milford-Montague | 1922 |
| 7. | Riegelsville | 1923 |
| 8. | Portland-Columbia | 1927 |
| 9. | Stockton-Centre Bridge | 1927 |
| 10. | Trenton-Morrisville, Calhoun Street | 1928 |
| 11. | Riverton-Belvidere | 1929 |
| 12. | Lower Trenton-Morrisville | 1929 |
| 13. | Frenchtown-Uhlertown | 1931 |
| 14. | Lumberville-Raven Rock (foot travel) | 1932 |
| 15. | Delaware-Upper Mt. Bethel | 1932 |
| 16. | Milford-Upper Black Eddy | 1949 |

### Toll Bridges

| | | |
|---|---|---|
| 1. | Bushkill Street Bridge, Easton-Phillipsburg | 1938 |
| 2. | Trenton-Morrisville | 1952 |
| 3. | Portland-Columbia | 1953 |
| 4. | Milford-Montague | 1953 |
| 5. | Delaware Water Gap | 1954 |

serve substantially the same traffic as that served by said existing bridges."

By its covenant the Commission obligated itself as follows:

" * * * that promptly upon opening the New Milford-Montague bridge for traffic it will close the existing Milford-Montague bridge and will proceed to demolish and remove the same, and that promptly upon opening the new Portland-Columbia bridge and the new Delaware Water Gap bridge for traffic it will close the existing Upper Mt. Bethel-Delaware bridge (the Bridge here in suit) and will proceed to demolish and remove the same and will close the existing covered bridge to all vehicular traffic."

Subsequent to the publication of the announcement by the Commission of its intention to open the new Portland-Columbia Bridge in December, 1953 and to simultaneously close and later demolish the Bridge in suit the plaintiffs filed their complaint and sought to stay the closing of the Bridge.

■■ Although neither party to the suit raised the question of the court's jurisdiction over the subject matter of and parties to this litigation the court, on its own motion, posed the problem. The District Court is one of limited jurisdiction and the parties cannot confer jurisdiction upon the court, and the court itself cannot acquire it if the proper jurisdictional requirements are lacking. McNutt v. General Motors Acceptance Corp. of Indiana, 1936, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135; Clark v. Paul Gray, Inc., 1939, 306 U.S. 583, 588, 59 S.Ct. 744, 83 L.Ed. 1001; Read v. Dickerson, 1941, 312 U.S. 656, 61 S.Ct. 713, 85 L.Ed. 1105. The inquiry was spurred particularly by an opinion rendered by the United States District Court for the Eastern District of Pennsylvania on October 25, 1949, Civil Action No. 9706 (unreported) wherein Alton F. Bowyer, et al., filed a complaint against the same defendant Commission as in this case.

In that case as here the plaintiffs were taxpayers and sought to enjoin the Commission's activities in connection with the issuance and sale of bonds and construction of approaches to the Easton-Phillipsburg Bridge, approaches to the new Trenton-Morrisville Bridge and its main structure. They were citizens of Pennsylvania and alleged that the Commission was a citizen of New Jersey. The court examined the issue of diversity of citizenship and held that no federal question was involved. The court stated:

" * * * Actually the Commission is 'the public corporate instrumentality of the Commonwealth of Pennsylvania and the State of New Jersey,' 'exercising an essential governmental function.' In other words, the Commission is not a citizen of either state, and no action can be maintained against it. It is Pennsylvania and New Jersey acting conjointly. A state is not a citizen under the Federal Constitution.

"Although a sovereign state may waive the beneficial provisions of the Eleventh Amendment and consent to be sued in a court of the United States by citizens of another state, New Jersey has not expressly consented to suit in this court. Pennsylvania has unquestionably permitted suit upon the legislation relating to the agreement in her own courts, as above noted, but has not consented to suit in this court. Neither could both states, nor either one, by consent, create diversity of citizenship between themselves and a private citizen of either. There is no jurisdiction in this court. * * *."

We find, however, that in Article II of the Agreement of 1934 the Commission was granted the unqualified power "(b) To sue and be sued."

It is apparent that the States of New Jersey and Pennsylvania created the defendant as a quasi-public body distinct from its parent states, and that in its attributes of citizenship it partook of the nature of a corporation chartered in two states. There has been some difference of opinion as to jurisdiction of a federal court over such multi-state corporations. However, it appears that the question is settled for this court in the case of Gavin v. Hudson & Manhattan Railroad Co., 1950, 185 F.2d 104, 27 A.L.R.2d 739, wherein the Court of Appeals for the Third Circuit dealt with the problem. The plaintiff in that case was a citizen of New Jersey who brought suit against the defendant in the District Court for the District of New Jersey alleging it to be a corporation of New York. The defendant answered that it was incorporated both in New Jersey and in New York and moved for a dismissal of the complaint on the ground that there was no diversity of citizenship of the parties, which was granted.

On appeal the Court said:

"What is needed here is a clear guide which will tell the parties where they may sue in federal court and where they may not. There are no political, economic, sociological or ethical considerations involved that we can see. The question is not unlike that of the rules of the road for traffic. It can travel on the right, or it can travel on the left, but a car driver must know which side he is to take. And so here. Can these plaintiffs get into federal court in New Jersey or not? The answer to this question does not settle the merits of their cases, and should not involve elaborate research by court or counsel as a preliminary to the settlement of the intrinsic right of plaintiffs to recover from defendant.

\*  \*  \*  \*  \*  \*

"Our conclusion is that these New Jersey plaintiffs can sue this company in New Jersey as a New York corporation, and that the District Court in holding the contrary, was incorrect. We think the rule we are declaring is more consonant with the general rules governing these multistate corporations and we think it is better in practice because it does not require useless ritual in instituting a suit away from home. We admit, however, that a different view of the matter has been expressed by two Courts of Appeals in other circuits." 185 F.2d at pages 106–107. See cases cited and also cf. Seavey v. Boston and Maine R. R., 1 Cir., 1952, 197 F.2d 485.

Although in the Gavin case the plaintiff, a citizen of *New Jersey*, sued, in this court, a defendant who was a citizen of both New Jersey and New York, while in this case plaintiffs, citizens of *Pennsylvania*, are suing the defendant, a corporate body of both New Jersey and Pennsylvania, in this court, there would appear to be no reason why the ruling in the Gavin case should not be applicable here.

Since the ruling of the court in the case of Bowyer v. Delaware River Joint Toll Bridge Commission, supra, was rendered in 1949, prior to the holding in the Gavin case, supra, and in the light of the latter it must be held that diversity of citizenship is present and more than three thousand dollars being in controversy, the court has jurisdiction over this suit.

The plaintiffs first contend that the provisions of the law passed by the Legislature of New Jersey in 1912 creating a joint commission with the State of Pennsylvania for the acquisition, maintenance and operation of toll bridges imposed upon the commission and its successor commissions the clear duty to operate and "keep in constant repair" any bridge which it acquired free of tolls. To support this proposal the plaintiffs point to various sections of

the 1912 Act of New Jersey among which are the following:

"Immediately upon the acquisition of, entry upon and taking possession of the bridge properties by the joint commission, the toll charges thereon shall cease and the bridges shall be free to the traveling public under such laws of the respective states and rules and regulations of the joint commission as may be prescribed." N.J.L.1912, c. 297, § 8, p. 529 as am. by N.J.L. 1919, c. 76, § 8, p. 152 and now found in R.S. 32:9–12, N.J.S.A.

"All bridges acquired pursuant to this chapter by this state jointly with the state of Pennsylvania, according as the bridges have a terminus in said states, respectively, shall be and remain in the charge and custody of any board or official that the respective governors of said states may designate.

"Such bridges and the immediate approaches thereto shall be maintained jointly by the two states in equal proportions, and shall be rebuilt, constructed, reconstructed and maintained and kept in constant repair and rebuilt when destroyed, and the expense incident thereto shall be borne equally by the two states; provided that appropriate concurrent legislation for the same purpose be enacted by the state of Pennsylvania." N.J.L. 1912, c. 297, § 10, p. 530 as am. by N.J.L.1919, c. 76, § 9, p. 153 and is now found in R.S. 32:9–15, N.J. S.A.

Next the plaintiffs contend that while the 1934 Act, N.J.L.1934, c. 215; N.J. S.A. 32:8–1, 32:8–15, created the present defendant the powers exercised by the commission under the 1912 Act were transferred to it and it was authorized to construct bridges to be financed from the proceeds of tolls, nevertheless, the 1934 statute contained a specific prohibition that no tolls should be charged upon the closing or demolition of the Bridge under the pretense that it was being replaced with a toll bridge. They call attention in this connection to a section thereof which directs that the commission shall cease to charge tolls for the use of a bridge upon the payment of bonds given for the acquisition of a bridge and providing that thereafter it shall be a free bridge and maintained equally at the cost of New Jersey and Pennsylvania by appropriations made for such purposes as provided by law for the maintenance of bridges over the Delaware River acquired by the State of New Jersey and the State of Pennsylvania. N.J.S.A. 32:8–11. They emphasize the concluding sentence of the 1934 Act as follows:

"It is the intention of the legislature of New Jersey that this act shall in no wise authorize tolls to be collected on bridges crossing the Delaware river now free bridges." N.J.L.1934, c. 215, § 4, p. 510, N.J. S.A. 32:8–15.

The plaintiffs further contend that the 1947 statute, N.J.L.1947, c. 283, pp. 993–994, does not amend or repeal either of the provisions of the 1934 Act above referred to and that the "replacement" of a free bridge with a toll bridge is in violation of the law. This view, they state, is reinforced by a reference to a sub-section of the 1947 Act which reads as follows:

"(i) The commission may fix, charge and collect tolls, rates, rents and other charges for the use of any bridge or bridges constituting a single project, such tolls to be fixed and adjusted, subject to any applicable Federal law, as to provide funds at least sufficient (1) to pay the cost of maintaining, repairing and operating such bridge or bridges, including the administrative expenses of the commission chargeable thereto, (2) to pay the bridge revenue bonds or the bridge revenue refunding bonds issued on account of such project and the interest on such bonds, and (3) to provide reserves for such purposes;

*provided, however*, that no tolls shall be charged or collected for the use of any bridge now operated by the commission as a free bridge but only for the use of bridges constructed or acquired by the commission under the provisions of this compact or agreement. * * * " N.J.L.1947, c. 283, at p. 995.

At this point the plaintiffs refer to a specific repealer contained in the 1947 Act affecting chapter 11A of Title 32 of the Revised Statutes, N.J.L.1935, c. 270 concerned with a bridge across the Delaware River at or near Yardley, Pennsylvania. They assert that this specific repealer in the 1947 Act evidences the intention of the New Jersey Legislature not to repeal any other portions of the 1912 Act and its amendments which provided that free bridges should be maintained and kept in constant repair but no tolls should be collected. They cite familiar rules of construction that repeal of statutes by implication is not favored.

The plaintiffs next contend that since no mention is made in the title of the 1947 statute, N.J.L.1947, c. 283, of power to replace a free bridge with a toll bridge, the statute cannot be construed to vest that power in the commission and that such a construction would enlarge its power over that granted by the Legislature of New Jersey.

It is the further contention of the plaintiffs that enactments passed by the Legislature of New Jersey subsequent to the 1947 Act clearly indicate that there was no intention in the 1947 Act to empower the Commission to close and demolish a free bridge. They cite the passage of two statutes, N.J.L.1951, c. 284, N.J.S.A. 32:8–11 to 32:8–11.4, and N.J.L.1952, c. 333, N.J.S.A. 32:8–2 to 32:8–3.4, as repeating and enlarging the jurisdiction of the Commission, but they assert that in no way is the power to replace free bridges by toll bridges mentioned in those statutes. They further cite an act of the New Jersey Legislature, passed on May 17, 1952, N.J.L. 1952, c. 219, N.J.S.A. 32:9A–1, in which the Commission was authorized to dispose of certain properties of the state, no longer deemed useful or necessary for the purposes of the Commission, *"other than bridges and approaches"*. They state that this exclusory language from this statute discloses that the legislature never intended to authorize the Commission to close or demolish any free bridge.

The plaintiffs also suggest that the concurrent resolution of the Senate and Assembly of the State of New Jersey of December 21, 1953 (N.J.L.1953, Senate Concurrent Resolution No. 2, supra,) is highly persuasive that the Legislature of New Jersey never intended to empower the Commission to close and demolish a free bridge.

There can be no question, as contended by the plaintiffs, that under the original legislation of the States of Pennsylvania and New Jersey the representatives of the people came to a realization that transportation over the bridges that spanned the Delaware River, the boundary line between the states, should be opened to the increasing traffic without the impediment of the payment of tolls to private owners of bridges controlling ingress and egress to and from them. Therefore the reciprocal legislation of the two states of 1912 and 1913 was passed creating a joint commission to acquire by purchase or eminent domain the bridge properties and the tax moneys of the states were appropriated for that purpose. It was naturally the intention at that time that once said bridges should become freed of private domination, they would not be again burdened with charges to users and would be maintained and operated at the expense of the states. Between the dates of this original legislation in 1912 and 1913 and the year 1932 pursuant to it and amendments passed by the respective legislatures of the two states, 15 bridges were acquired and freed, and the cost thereof was borne by the treasuries of the states in equal proportions.

Out of Pennsylvania's legislation of 1931 and 1933 and New Jersey's enactment of 1934 the two states entered into the Agreement of 1934 to which the required consent of the Congress of the United States was granted by its enactment of 1935. The Agreement of 1934 encompassed the mechanism represented by the joint commission of the states which had functioned until that time and transferred its responsibilities to a successor corporate entity, the Delaware River Joint Toll Bridge Commission, with a widened field of power and duty. By Article II of the Agreement of 1934, N.J.S.A. 32:8–3, it achieved the powers, among others, of permanent succession; to sue and be sued; to form its organic pattern by the adoption of by-laws and election of officers and appointment of employees; to deal in real and personal property; to exercise eminent domain; to raise money by borrowing and, in addition, it was vested with the powers and duties theretofore held and exercised by its predecessor commission theretofore constituted by reciprocal legislation of the states. The purpose for which it was clothed with these powers is stated in Article I of the said Agreement to be

"a. The administration, operation and maintenance of the joint state-owned bridges across the Delaware river between the state of New Jersey and the commonwealth of Pennsylvania, and located north of the present stone arch bridge of the Pennsylvania Railroad across the Delaware river from Trenton to Morrisville;

"b. The investigation of the necessity for additional bridge communications over the Delaware river north of the said railroad bridge, and the making of such studies, surveys, and estimates as may be necessary to determine the feasibility and cost of such additional bridge communications;

"c. The preparation of plans and specifications for, and location, construction, administration, operation and maintenance of, such additional bridge communications over the Delaware river, north of the aforesaid railroad bridge, as the commission deems necessary to advance the interests of the two states and to facilitate public travel; and the issuance of bonds and obligations to provide moneys sufficient for the construction of such bridges, and the collection of tolls, rentals, and charges for the redemption of such bonds and obligations, and the payment of interest thereon * * *." N.J.L.1934, c. 215, pp. 500–501, N.J.S.A. 32:8–2.

It is patent that the 1934 Agreement was designed to alter the form of financing the acquisition, construction, maintenance and operation of bridges between the states of New Jersey and Pennsylvania over the Delaware River north of Trenton, beginning with the old stone arch railroad bridge.

No longer were the representatives of the people satisfied to draw from their respective state treasuries the cost of these facilities. It is plain that a new enterprise was being launched whereby the corporate facility created by the states, the Commission, would finance these bridge facilities and those to be thereafter constructed out of monies to be borrowed on the credit of anticipated returns by way of tolls to be paid by those who used the facilities, except that the Commission was prohibited from imposing tolls on a bridge that had been freed. When the indebtedness incurred by the Commission for the construction of any bridge was liquidated, that bridge was likewise to be freed from tolls thereafter. However, it is clear that tolls from those bridges liable to such imposts rather than the state treasuries were to be the source of financing the construction of new bridges and the maintenance and operation of all, with, again, a qualification, under Article X of the Agreement of 1934, N.J.S.A. 32:8–11, whenever bonds

and interest upon a particular bridge had been liquidated, and it had been freed of tolls, it was to be maintained at the cost of New Jersey and Pennsylvania equally by appropriations by the states as provided prior to the Agreement of 1934. But in the Acts of the respective states, N.J.L.1934, c. 215, § 2, p. 509, N.J.S.A. 32:8–1 et seq., and Pa.Act of May 18, 1933, P.L. 827, Article X, § 2, 36 P.S.Pa. § 3401 note, provision was made for the contribution by each state of $20,000 for the purposes of the Commission except the operation, maintenance, improvements or construction of any new toll bridge, and the Commission was charged with the return of this appropriation with interest to each state source within five years after the completion of the first toll bridge.

The Supplemental Agreement of 1947 notices in its prefatory passages the great increase in traffic and loads over the bridges, their inadequacy and unsafeness and the necessity to rehabilitate or replace some or all of them. It also noted therein the necessity for the Commission to have wide power in financing a program of rehabilitation, replacement and construction of additional bridges. Therefore it amended Article X of the Agreement of 1934 to vest in the Commission fuller authority to carry out its objectives. The southern geographical boundary of the Commission's jurisdiction was extended to the line between Mercer County and Burlington County in New Jersey as projected across the Delaware River to Pennsylvania. Among the other grants of authority appearing in the New Article X were the following:

"(b) The commission may replace any one or more existing bridges across the Delaware River between the Commonwealth of Pennsylvania and the State of New Jersey north of said line with one or more new bridges at such locations as the commission may determine to be adequate and convenient for the traffic to be served thereby.

\*　　\*　　\*　　\*　　\*　　\*

"(e) The commission may demolish and remove any bridge now operated by it when such bridge has been or is being replaced by a new bridge at the same or a different location which in the determination of the commission will serve substantially the same traffic as that served by such existing bridge, and the commission may sell or otherwise dispose of any ferry or other property of the commission deemed by it to be no longer useful or needed for the purposes of the commission." 61 Stat. 754.

Also granted was the following power to finance its purposes:

"(h) The commission may provide, from time to time, for the issuance of its bridge revenue bonds for any one or more of the following purposes: (1) providing funds for the acquisition, construction, rehabilitation or improvement of any one or more bridges the acquisition, construction, rehabilitation or improvement of which is herein authorized; (2) providing funds for the construction or improvement of approach facilities deemed by the commission to be necessary or desirable in connection with the acquisition, construction, maintenance or operation of any bridge owned or operated by the commission, including but without limitation bridge approaches, entrance plazas, overpasses, underpasses and approach highways; and (3) refunding any bridge revenue bonds or bridge revenue refunding bonds of the commission. The bridge or bridges (including any approach facilities) on account of which a single issue of bonds shall be issued as herein authorized shall constitute a single project for financing purposes." 61 Stat. 755.

Under the authority granted under the Agreement of 1934 the Commission issued bridge revenue bonds and refunding bonds and paid for the construction of the toll bridge known as the Bushkill Street Bridge between Easton, Pennsylvania and Phillipsburg, New Jersey which was completed and opened to the public on January 17, 1938.

In 1950 the Commission sold revenue bonds in the amount of $14,500,000 for the construction of the Easton Approach to the Bushkill Street Bridge, Trenton-Morrisville Bridge and the retirement of outstanding bonds and notes of the Bushkill Street Bridge and the Trenton Bridge.

Also in 1950 the Commission authorized its engineers, consulting engineers and attorneys in conjunction with the engineers of the Highway Departments of the two states to proceed with technical investigations and surveys and to make reports upon new crossings of the Delaware River and approaches thereto. As a result a report was made on the Upper Mt. Bethel-Delaware Bridge (this Bridge), the Portland-Columbia Bridge and the Milford-Montague Bridge. In the Commission's annual report for the year 1950 to the Governors of the two States, the inadequacies and dangers of these bridges are set forth in detail.[12]

On March 1, 1952, the Commission, reporting similarly for the year 1951, related developments disclosing the commencement of construction on the three bridges and the scheme of financing which combined the three new structures with the existing Easton-Phillipsburg Bridge and the Trenton-Morrisville Bridge then under construction under an

12. Following is an excerpt from the report rendered to the Commission on the condition of this Bridge:

"The roadway of the bridge is divided by the center truss of the structure. Vehicles thereby passing from an open space twenty to thirty feet wide into a throat 11'0" wide. In general the throat is entered at speeds ranging up to thirty miles per hour. This condition has resulted in one death and numerous accidents, the one death was the result of a driver's failing to enter the throat of the bridge, and hitting the end post of the middle truss. The Commission built a concrete island at the end of the truss which helped to prevent but did not stop accidents and further damage to the bridge. Additions were made to the islands for the protection of the middle truss. It served its purpose as far as protection of the bridge but accidents continued and will continue as long as the two lane bridge exists. With increased speeds of vehicles the divided roadway structure is not conducive to the free and safe movement of vehicles.

"Repairs and improvements of the bridge on the part of the Commission have been minor, and made only in order to offer the protection deemed necessary. Prior to the purchase of the bridge, the engineers of the Commission were fully aware of the condition of the steel and the floor system. This condition was reported to the Commission and its attention called to the serious condition of the floor for a number of years past. Requests were made for funds for the replacement of the floor and later for the reconstruction of the abutments and remodeling the trusses to provide expansion of the steel. The first request was made in 1937. It was not acted upon. Similar requests were made from time to time by the Commission up to 1943 and the requests have been denied. No request for funds has been made since 1943. The cost of doing the work today would, no doubt, run to $300,000.00. Even with an expenditure of State funds of this amount, the Commission would still have on its hands an obsolete, dangerous and inadequate bridge for present-day traffic.

"Within the year the Bureau of Public Roads made an inspection of the bridges across the Delaware River connecting federal highways in New Jersey with federal highways in Pennsylvania and have reported that this bridge between Upper Mt. Bethel and Delaware is the only bridge on the Delaware River on federal routes which is under capacity. The engineer making this report inquired of the New Jersey Highway Department what the Commission intends to do in the way of replacing the structure." Annual Report to the Governors and Legislatures of the Commonwealth of Pennsylvania and the State of New Jersey by the Delaware River Joint Toll Bridge Commission, 1950, p. 61.

issue of $15,000,000 of Revenue Bonds, Series B.[13]

A review of the activities concerning the replacement of this Bridge, the Milford-Montague Bridge and the construction of the Delaware Water Gap Bridge from the beginning, covering details of construction costs and other factors together with approximations of the time of the completion of each structure and the relief of the public from the obligation to use the old structures was contained in the Commission's Annual Report for the year 1952.[14]

█ As the plaintiffs themselves point out, the law on the subject under consideration may not be interpreted from any one piece of legislation. It must be viewed as a whole. Moreover, in this case it cannot be regarded unilaterally but rather, as the laws of both contracting states fused their agree-ments to act in concert, as appears from the Agreement of 1934 and their Supplemental Agreement of 1947, in the form to which Congress gave its consent. For a validation by the United States Supreme Court of the Agreement of 1934 unfettered by provisions of the New Jersey Act of 1912, see the case of Delaware River Joint Toll Bridge Commission, Pennsylvania-New Jersey v. Colburn, 1940, 310 U.S. 419, 60 S.Ct. 1039, 84 L.Ed. 1287.

In a consideration of this case the proviso in Article X, subsection (i) of the Supplemental Agreement of 1947,

"* * * provided, however, that no tolls shall be charged or collected for the use of any bridge now operated by the commission as a free bridge but only for the use of bridges constructed or acquired

13. "The Secretary of the Army and Chief of Engineers of the United States have approved the locations, plans and specifications of the three new crossings, and all other necessary consents from governmental authorities of Pennsylvania and New Jersey have been obtained.

"The Federal authorities have determined that the three bridges are important to both National Defense and Civilian Economy. They have further determined that the bridges are important to public health and safety, and will replace substandard structures. They have approved the construction of the bridges and have made available to the Commission the necessary steel for the substructure, and have advised the Commission that the necessary steel for the superstructure will be allotted.

"Construction work on all three projects was started on October 15, 1951."

\* \* \* \* \*

"The three new structures were combined for financial purposes with the existing Easton-Phillipsburg Bridge and the Trenton-Morrisville Bridge, presently under construction between Trenton, New Jersey, and Morrisville, Pennsylvania. The Commission received bids on September 24, 1951, for the sale of $15,000,000 Revenue Bonds, Series B, and awarded the issue, carrying a coupon rate of 2.35% per annum, to Bears, Sterns & Company, of New York City.

"The total estimated cost of the three bridges is $13,357,000, excluding interest during construction." Annual Report to the Governors and Legislatures of the Commonwealth of Pennsylvania and the State of New Jersey by the Delaware River Joint Toll Bridge Commission, 1951, p. 63.

14. Under the heading "Replacement of Bridges—Upper Mt. Bethel, Pennsylvania-Delaware, New Jersey Bridge Milford, Pennsylvania-Montague, New Jersey Bridge and Construction of the Delaware Water Gap Bridge" the concluding paragraphs are as follows:

"While it is impossible to set the time of completion for the three structures due to economic and weather conditions it is anticipated that the construction of the Milford-Montague Bridge and the Portland-Columbia Bridge will be far enough advanced on August 1, 1953 to permit them to be opened to the public. The opening of the Delaware Water Gap Bridge to the public is not anticipated until about November 1, 1953.

"Confronted with ever-increasing traffic between the two States as will be noted elsewhere in this report, the Commission and its engineers are doing everything within their power to insure the opening of the three structures at the earliest possible date thereby relieving the public of being obligated to use the present horse and buggy facilities over the Delaware River at Delaware, N. J., Portland and Milford, Pa." Annual Report of the Commission, supra, p. 61.

by the commission under the provisions of this compact or agreement." must be read with the provisions of subsections (b) and (e) of the same Article X

"(b) The commission may replace any one or more existing bridges across the Delaware River between the Commonwealth of Pennsylvania and the State of New Jersey north of said line with one or more new bridges at such locations as the commission may determine to be adequate and convenient for the traffic to be served thereby.

\*　\*　\*　\*　\*　\*

"(e) The commission may demolish and remove any bridge now operated by it when such bridge has been or is being replaced by a new bridge at the same or a different location which in the determination of the commission will serve substantially the same traffic as that served by such existing bridge, and the commission may sell or otherwise dispose of any ferry or other property of the commission deemed by it to be no longer useful or needed for the purposes of the commission."

The limitation of the proviso in subsection (i) does not restrict the power of the Commission to charge tolls for the use of a bridge constructed or acquired by it, even though such a structure replaces one which the Commission has demolished. The language in the Agreements of 1934 and 1947 and the legislation of both states which gave them being, when viewed as a whole, indicates clearly that any construction of new bridges under the Agreements is to be financed by the Commission by the only avenue open to it and that is revenue raised by charging tolls for the use of its projects.

The Agreements contemplated a departure from the former system of acquisition, maintenance and operation of bridges between the States. The procedure authorized under the Supplemental Agreement of 1947 gave particularly wide power to the Commission. The Commission could issue securities pledging the anticipated tolls from one bridge to be constructed, or combine several bridges as a project. It could replace bridges with new bridges at such locations as the Commission might determine were adequate and convenient for the traffic to be served thereby. It could demolish and remove any bridge when it had been or was being replaced with a new bridge at the same or different locations which, in the determination of the Commission, would serve substantially the same traffic as that served by the existing bridge. These powers the plaintiffs do not contest. They are prepared to fully concede that the Commission may demolish the Bridge in question and replace it with another, but, say they, "replace" can only be meant in the dictionary definition to "place again, restore to a former place, condition and the like," etc., (Webster) and they say that a new bridge restored *with toll charges* would not constitute a "replacement".

But the 1947 Agreement made crystal clear the powers of the Commission and that it would be expected to carry out its objectives on the basis of funds received from toll bridges and not from the treasuries of the States or other sources. It indicates a realization upon the part of the legislatures of the two States that with the growth of population and the fabulous increase in vehicles [15], the prob-

---

15. Comparative figures in the approximately 40 years between the original legislation to free bridges and the time of the proposed demolition of the Bridge discloses that the population of New Jersey was 2,537,167 in 1910, while in 1950 it was 4,835,292 (1950 Census of Population, U. S. Dept. of Commerce, Bureau of the Census, p. 30–6).

The count of automobiles registered in New Jersey shows the following fabulous increase: in 1915 there were 82,000 vehicles (Statistical Abstract of the United States, U. S. Dept. of Commerce, Bureau of the Census, 1953, p. 543). In 1952, there were 1,746,068 vehicles (Highway Statistics 1952, U. S. Dept. of Commerce, Bureau of Public Roads, p. 26).

lem of financing these avenues of travel would have to be approached in a different manner from that formerly used and similar to the method of the Authorities of the Ports of New York and Delaware (formerly The Delaware River Joint Commission [Camden-Philadelphia Bridge]).

Following the course charted for it the Commission made no secret of its intention to replace the Bridge as well as others in this area of the Delaware River. It determined the inadequacy and, indeed, danger inherent in the continued use of the Bridge. We have seen from its published reports that this was done publicly. Where was the money to come from to carry out these improvements?

It is significant in this connection to note that the specific power to demolish a bridge was granted to the Commission for the first time in subsection (e) of Article X of the Supplemental Agreement of 1947. Deeming itself to be so authorized, the Commission committed the tolls to be collected from the new structures and contracted that this Bridge and others would be closed and demolished. After the new bridges had been fully constructed with the moneys advanced to the Commission under its covenants and upon the eve of the closing of this Bridge in accordance therewith, the plaintiffs pressed their alleged equities in the form of this suit.

In this regard the plaintiffs, for themselves and those they say they represent, appear to take the position that the Commission is confiscating *their* Bridge; that it was purchased in 1932 with *their* moneys; that they were in effect guaranteed that the Bridge would remain in existence always by way of maintenance and replacement if necessary, and be forever free to their use. It must, however, be recalled that it was the money not only of the citizens of Pennsylvania but as well the citizens of New Jersey, and not only those citizens who used the Bridge but many thousands who never saw it that paid for the Bridge in 1932, and it was freed not only to taxpayers of the States but to any who desired to use it. It was a venture of the States for the benefit of all.

■ Treating the situation of the present plaintiffs with sympathy for such loss as they may be called upon to sustain by reason of their subjection to tolls for bridge crossing and alleged loss in property values due to discontinuance of free bridge travel, they can be said to be legally in no different position from an owner of property on a public highway that is by-passed by a new and modern re-route. The lack of redress for such loss is a calculated risk that goes with membership in a society wherein the greatest good for the greatest number is the objective. As to such a claim it has been said:

"In diverting traffic from in front of the Nelsons' buildings to the new route there is no invasion of their rights nor is there any legal injury to the land remaining. Access to their buildings remains unchanged. The buildings and lands about them will remain exactly as before establishment of the new route except that travel past the buildings will doubtless be diminished. But the State owes no duty to the Nelsons in regard to sending public travel past their door. Our trunk line highways are built and maintained to meet public necessity and convenience in travel and not for the enhancement of property of occasional land owners along the route. Benefits which come and go with changing currents of public travel are not matters in which any individual has any vested right against the judgment of those public officials whose duty it is to build and maintain these highways. The Nelsons are not entitled to receive any compensation for diversion of traffic as allowed in the last item set forth in the elements of damages. This appears to be in line with the holdings of other courts in every instance where this question has been considered under constitutional and

statutory provisions similar to ours. [Cases cited.]" Nelson v. State Highway Bd., 110 Vt. 44, 1 A.2d 689, 693, 118 A.L.R. 915, 920. See also Delaware River Joint Toll Bridge Commission v. Colburn, supra.

I have examined the other theories of the plaintiffs, one of them being that since there was a specific repealer in the New Jersey Act of 1947, N.J.L.1947, c. 283, § 4, rescinding legislation for the construction of a bridge across the Delaware River at Yardley, Pennsylvania, N.J.L.1935, c. 270, which is evidence that the New Jersey Legislature did not intend to repeal any portion of its 1912 Act and amendments which provided that free bridges should be maintained and repaired without the collection of tolls and that repealer of these by implication should not be countenanced. This theory cannot be favored in the light of the construction given herein to the Supplemental Agreement of 1947.

The contention of plaintiffs that failure to specify in the title of the 1947 legislation of New Jersey, N.J.L. 1947, c. 283, that power was granted to replace a free bridge with a toll bridge precludes the Commission from closing and demolishing the Bridge, as an act beyond any power granted to it by that legislation, cannot stand. Enough information was contained in the title of the Act to inform the ordinary reader of the purpose of the legislation, the general subject of which was fairly expressed. As was said in Bucino v. Malone, 1953, 12 N.J. 330, 344, 96 A.2d 669, 676:

"The title of a statute is a label, not an index. It is unnecessary and in fact undesirable for a title to give a résumé of the provisions of the act. The constitutional provision [Art. IV, Section VII, par. 4 of the New Jersey Constitution] is complied with when the title gives notice to the Legislature and the public of the general purpose of the act."

Moreover, the title and the body of the Act were clearly informative that its grants of powers were to be in combination with the action of the State of Pennsylvania and that the agreement consummated thereby would be the governing authority of the Commission created by the combined acts of the States. The alleged omission to particularize in detail in the title of the New Jersey legislation of 1947 all features of the powers vested in the Commission cannot be held to invalidate the law or now strike down the Supplemental Agreement of 1947.

Another support for the theory of the perpetuity of free bridges advanced by the plaintiffs was that in legislation subsequent to 1947, N.J.L.1951, c. 284 and N.J.L.1952, c. 333, the New Jersey Legislature disclosed a clear indication that it had no intention in the 1947 Act of empowering the Commission to close and demolish a free bridge because while the powers of the Commission were again enlarged by these subsequent acts, no specific mention is made of power to replace a free bridge with a toll bridge. This is an extension of plaintiffs' argument that repealer by implication of what they consider implicit authority for perpetual free bridges beginning with the 1912 legislation, must not be favored. As held herein, it cannot be granted the merit claimed for it.

Similar support claimed by plaintiffs in the enactment of 1952 by the Legislature of New Jersey, N.J.L.1952, c. 219, N.J.S.A. 32:9A–1, must likewise fall. In this statute the disposition of property "other than bridges and approaches" was authorized. It merely referred to property acquired by New Jersey in connection with the acquisition of the joint state owned bridges determined to be no longer needed or useful in administering the bridges and that the proceeds should be paid into the General State Fund of New Jersey. The exclusory language hardly reflects the light claimed for it by the plaintiffs, namely that it shows that the Commission was never empowered to close or demolish a free bridge and substitute therefor a toll bridge.

Nor does the Concurrent Resolution of the New Jersey Legislature filed on December 30, 1953 (N.J.L.1953 Senate Concurrent Resolution No. 2) carry with it persuasion that its predecessor body of 1947 did not intend that the Commission should be empowered to close and demolish the Bridge. This was passed after the complaint in this suit was filed. It noted the possibility of the failure of jurisdiction in this suit and requested the Attorney General of New Jersey to institute a suit in the Superior Court of New Jersey for the same injunctive relief that this suit seeks. It does no more than indicate that it was the consensus of the legislators that the question raised here should be litigated in the New Jersey Court in the event that this suit became terminated by failure of jurisdiction of this court over it.

The authorization to close and demolish this Bridge has come about through logical evolution in the planning by the Legislatures of the States to meet the requirements of adequacy and safety in modern transport facilities. The contention of the plaintiffs that a "replaced" bridge must be free of tolls cannot be sustained where, as here, the tolls do not go into the pockets of private bridge owners but into the construction, maintenance and operation of transport facilities determined to be adequate and safe. Indeed this is in no wise inconsistent with any expression in any of the New Jersey Legislative enactments presented by the plaintiffs. This Bridge, after its acquisition by the States, is to remain free as long as it exists. It has been replaced at a location determined to serve substantially the same traffic. Of course, it has not been replaced by the same kind of bridge and has a greatly improved equivalent. The 64-year-old structure converted to vehicular traffic from a railroad bridge has been *replaced* by a modern span designed to meet traffic undreamed of and unimagined at the date of its construction. Incidental to its replacement, tolls will be charged the users of the new construction by a public body in the interest of the public in its largest sense pursuant to the legislative plans of New Jersey and Pennsylvania. To adopt the plaintiffs' constructions and contentions would defeat the intent of the Agreement of the States and, coming after the consummation of commitments of the Commission to those whose money has been provided and used for the construction of and payment for the facilities under discussion, would unjustifiably impair the obligation of the Commission's covenant to close and demolish the Bridge.

Therefore the complaint of the plaintiffs must be dismissed and judgment entered in favor of the defendant.

The requirement of Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C., shall be considered satisfied by the recital of the findings of fact and conclusions of law as set forth in this opinion.

An order for judgment in conformity herewith should be settled on April 5, 1954.

**McGRAW ELECTRIC CO. et al.**

v.

**UNITED STATES et al.**

Civ. No. 7973.

United States District Court,
E. D. Missouri, E. D.

March 19, 1954.

