**Arthur D. BARTRON and Anna Katherine Bartron and Nicholas or Nick Ronca, Appellants,**

v.

**DELAWARE RIVER JOINT TOLL BRIDGE COMMISSION, a Body Corporate Created by the Legislature of the State of New Jersey and the Commonwealth of Pennsylvania.**

No. 11339.

United States Court of Appeals, Third Circuit.

Argued Oct. 13, 1954.

Decided Nov. 17, 1954.

---

Isadore Glauberman, Jersey City, N. J., for appellants.

J. Lawrence Davis, Bangor, Pa. (Backes & Backes, Herbert W. Backes, Trenton, N. J., John H. Pursel, Phillipsburg, N. J., Mitchell & Pershing, Robie L. Mitchell, New York City, on the brief), for defendant.

Before GOODRICH, KALODNER and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

By this suit the plaintiffs, citizens of Pennsylvania, seek to enjoin the defendant, the Delaware River Joint Toll Bridge Commission (Commission), from closing and demolishing a bridge called the Delaware-Upper Mt. Bethel Township Bridge which crosses from Pennsylvania to New Jersey. This bridge is known locally as the "Delaware" bridge. The district court refused the injunction and entered judgment dismissing plaintiffs' complaint. D.C.D.N.J.1954, 120 F.Supp. 337. Subsequently, the district court denied an application to stay the closing of the old bridge but granted a stay of demolition pending appeal to this court.

The defendant Commission was created by the action of the Pennsylvania and New Jersey legislatures.[1] Its powers and duties are defined in an interstate compact entered into by the Governors of each state pursuant to this legislation and approved by the Congress

[1] Pa.Stat.Ann. tit. 36, § 3401 (Purdon 1942); N.J.Stat.Ann. § 32:8–1 to 32:8–15 (1940).

This Commission is the successor to a "Joint Commission" which was established in 1912 and continued in existence until replaced in 1934. See Pa.Stat.Ann. tit. 36, § 3271 et seq. (Purdon 1942), Pa. Act of July 25, 1913, P.L. 1277 as amended; N.J.Stat.Ann. § 32:9–1 to 32:9–16 (1940).

of the United States.[2] This compact was first entered into in 1934 and it was amended in 1947.

■ The first question is whether the federal court for the district of New Jersey had jurisdiction. The district court thought it had, basing its conclusion upon our decision in Gavin v. Hudson & Manhattan R. Co., 3 Cir., 1950, 185 F.2d 104, 27 A.L.R.2d 739. The case is obviously in point and was controlling unless a distinction is to be made between the type of corporation here involved and the railroad involved in the Gavin case. We do not see any reason for making such a distinction especially since the Commission "may sue and be sued."[3] The court, therefore, had jurisdiction by reason of diversity and we do not need to inquire whether there were other grounds or not. In any event, the decision will turn upon interpretation of local statutes and the interstate compact. There is virtually no case law helpful upon the question and we have to reach our conclusion from examination of the legislation as best we can.[4]

■ Jurisdiction being settled, the next question is whether the plaintiffs have legal basis on which to base their argument against the exercising of the Commission's authority to close this bridge. This point was considered in thorough detail by Judge Forman before whom the case was tried in the district court of New Jersey. His opinion, cited above, covers almost every argument which was made in this court. We agree with the conclusion Judge Forman reached and the basis on which he reached it.

We could almost stop here for there really is little to add. But the case has been pressed with earnestness and since some points were stressed more strongly here we shall briefly indicate why we think the district judge was right and dispose of these other points.

The plaintiffs, through their counsel, go back into legislation as far as 1912. They treat of the legislation there and again the legislation in 1919 and the late Twenties. They step from there to the acts creating this Commission, already mentioned, and draw certain conclusions. These conclusions are that the policy shown in the earlier statutes continues somehow to pervade what we may call the toll bridge field. Plaintiffs find in these earlier statutes a state declared policy to provide free bridges across the Delaware River. Undoubtedly, at the beginning this was so. The defendant's predecessor did buy privately owned toll bridges and did open them free to the public.

It is equally clear, however, that the legislation which came in the Thirties showed a distinct change of policy by the legislatures of the states which created the Commission and, as we know from common knowledge, throughout the country generally. Times were harder. Traffic was increasing. New facilities were necessary but the legislatures felt that the new facilities would have to be paid for by the people who got the benefit of their use. That is what the 1934 legislation provided for and that is made even clearer by the supplemental compact of 1947[5] which in turn was approved by the Congress of the United States.[6]

2. 49 Stat. 1051, at page 1058 Act Aug. 30, 1935.

3. Pa.Stat.Ann. tit. 36, § 3401, Art. II(b) (Purdon 1942); N.J.Stat.Ann. § 32:8-3, Art. II(b) (1940).

4. We are aware of Delaware River Joint Toll Bridge Commission v. Colburn, 1940, 310 U.S. 419, 60 S.Ct. 1039, 84 L.Ed. 1287. That case involved the question of liability of the Commission for depriving property owners of light, air and view caused by the erection of a bridge approach. In reversing the state court

decision holding the Commission liable, the Supreme Court ruled that the provisions of the Act of 1912 providing for such damages were not to be read into the 1934 compact even though the compact adopted the eminent domain procedures of the 1912 Act. This case does not materially aid us in solving the problem with which we are faced.

5. Pa.Stat.Ann. tit. 36, § 3401 (Purdon Supp.1953); N.J.Stat.Ann. § 32:8 to 32:-11 (Cum.Supp.1953).

6. 61 Stat. 752 Act Aug. 4, 1947.

We think that the language of the preamble to this supplemental compact plus the amendment of Article X of the original compact show so clearly as to leave no question that the Commission is within its authority in doing what it proposes to do here. Here is the language from the preamble to the supplemental compact:

" 'Whereas, Because of the great increase in traffic and loads over said bridges since their construction, many of said bridges are now inadequate or unsafe, and it will be necessary to rehabilitate or replace some or all of said bridges with new bridges at the same or different locations in order to provide safe, adequate and convenient facilities for traffic crossing the Delaware river; and

" 'Whereas, It is necessary that the commission have power to issue and sell its bridge revenue bonds, for rehabilitating or replacing existing bridges with new bridges at the same or different locations, for acquiring or constructing additional bridges, and for refunding any bridge revenue bonds of the commission, and that the commission also have power to fix, charge and collect tolls, rates, rents and other charges for the use of any such new bridge or bridges * * *.' "

And here is the language of the amended Article X of the compact:

"(b) The commission may replace any one or more existing bridges across the Delaware river between the Commonwealth of Pennsylvania and the State of New Jersey north of said line with one or more new bridges at such locations as the commission may determine to be adequate and convenient for the traffic to served thereby.

\* \* \* \* \* \*

"(e) The commission may demolish and remove any bridge now operated by it, when such bridge has been or is being replaced by a new bridge at the same or a different location, which in the determination of the commission will serve substantially the same traffic as that served by such existing bridge, and the commission may sell or otherwise dispose of any ferry or other property of the commission deemed by it to be no longer useful or needed for the purposes of the commission."

The plaintiffs say that if the Commission can close this Delaware bridge then it must provide another free bridge to take its place. They say that while the Commission does not have power of taxation it can use the toll it, gets from other bridges to pay for the free one which these plaintiffs want. To this the Commission answers that its toll bridge business is precarious in some spots and excess money is not available for such use. We make the further answer that there is nothing we find in the legislation which will allow us or the plaintiffs to tell the Commission how to run its bridge-building affairs.

The thing which irks the plaintiffs is not only the closing of this Delaware bridge but the fact that a new bridge, fit to handle the present-day flow of traffic, has been opened about two and a half miles north of the old bridge. Improved facilities are present, but individual users have to pay for them.

■■ The particular point on which the plaintiffs attack the Commission with regard to the new bridge is a covenant contained in the bonds issued by the Commission to finance the new structure. By this covenant the Commission obligated itself to close the Delaware bridge. The plaintiffs say that entering into this covenant was beyond the power of the Commission. They claim that in so doing the Commission has prevented itself from exercising that discretion which it is lawfully bound to exercise. They claim further that this constitutes a pledge of state property. The Commis-

sion is not authorized to pledge state property.[7]

This argument was evidently not pressed as a main point in the district court at the final hearing. Judge Forman, near the end of his opinion, added that the adoption of plaintiffs' contentions at this late date would "unjustifiably impair the obligation of the Commission's covenant to close and demolish the Bridge." [120 F.Supp. 354.] Taking their cue from this language plaintiffs have presented in full to this court the argument stated above.

We do not think this argument is any better than the main proposition. The argument that what the Commission has done is to pledge state property is so attenuated and fanciful that it does not require any answer except to say that there is nothing in it.

With regard to the covenant, two things may be said. Article II, (p) of the interstate compact says that the Commission is authorized to exercise "any and all powers which might be exercised by a natural person or a private corporation in connection with similar property and affairs." The Commission is also given express authority "To enter into contracts." Article II, (h). We think it is quite clear that a private person or business corporation could make an agreement to close one place where business was being done by it when it was trying to borrow money to finance a new building. So here we think this Commission could agree to close the old facilities in order to get people to lend money to build new ones.

Further, it appears that the conclusion to build a new bridge and to close this old bridge is all part of a rather comprehensive, thought-out piece of planning made after survey and full consideration by this Commission. It appears that the plans were considered, voted and settled by the Commission as part of a general improvement project before any covenant was made at all with the bondholders in the public offering. The Commission did not covenant away its discretion; it had exercised its discretion.[8] Then, to make effective its exercise of discretion it issued these bonds with assurance to purchasers that the toll bridge would not be competing with a free bridge next to the one on which their money was being spent. We see no reason why, if the Commission could close the old bridge, it could not covenant to do so. But more than that we think the closing of the old bridge was part of the plan adopted before any covenant was made.

It can be readily acknowledged that these plaintiffs and others are subjected to inconvenience by having their free facilities replaced by substitutes for which they must pay or else travel some distance to get another free facility. If traffic had not mushroomed so in this motor age each of the complaining citizens would still be able to use this old bridge. But in the process of developing new facilities these citizens suffer the inconveniences inherent in the changes necessary to cope with the problem of modern-day traffic. This is no more than the inconvenience suffered by many of us in the changes brought about by this same problem.

The judgment of the district court will be affirmed.

7. Pa.Stat.Ann. tit. 36, § 3401, Art. IV (Purdon 1942); N.J.Stat.Ann. § 32:8-5 (1940).

8. An examination of the Annual Reports of this Commission for the years 1950 and 1951 indicates it had decided to replace and close this bridge before the bids on the bond issue were received in September 1951.