FRANK BUCINO, *ET AL.*, PLAINTIFFS-APPELLANTS, v.
ARTHUR C. MALONE, CITY CLERK OF HOBOKEN,
DEFENDANT-RESPONDENT.

Argued April 20, 1953—Decided April 30, 1953.

*Mr. Frank G. Schlosser* argued the cause for the appellants.

*Mr. Otmar J. Pellet* argued the cause for the respondent (*Mr. Dominick J. Marrone*, attorney).

*Mr. Joseph Lanigan* argued the cause for the intervenor (*Mr. Theodore D. Parsons*, Attorney-General).

The opinion of the court was delivered by

VANDERBILT, C. J. This appeal questions the constitutionality of the Faulkner Act, *L.* 1950, *c.* 210, *N. J. S. A.* 40:69*A*–1 *et seq.*

The facts are not in dispute. Since 1915 the City of Hoboken has been governed under the Walsh Act, *R. S.* 40:70–1 *et seq.*, by a board of five commissioners. On May 8, 1951 the present commissioners were elected for a term of four years. Soon after taking office the city commission adopted a resolution submitting to the voters the question of electing a charter commission under the Faulkner Act, hereinafter described. At the general election of 1951 the people voted in favor thereof and elected a charter commission. After some months of study the charter commission in August 1952 recommended Plan D under the Mayor-

Council Division of the act with a nine-member council as the most desirable form of government for the city. Pursuant to the provisions of the act there was submitted to the voters at the general election of 1952 the question:

"Shall the following plan take effect? 'Shall Mayor-Council Plan D of the Optional Municipal Charter Law, providing for a division of the municipality into six (6) wards with nine (9) councilmen, one (1) to be elected from each ward and three (3) to be elected at large, be adopted by the City of Hoboken?'"

The plan was approved by a vote of 8,765 to 8,658 and an election to choose a mayor and nine councilmen is scheduled for May 12, 1953.

The plaintiffs, six taxpaying residents of the city, brought this action challenging the constitutionality of the act and seeking to prevent the scheduled election. The defendant is the city clerk, whose duty it is under the Act to place the question of the adoption or rejection of Plan D on the ballot. The Attorney-General intervened under *Rule* 3:24-2 to uphold the constitutionality of the act. The trial court held the act valid and dismissed the action. While the appeal was pending before the Appellate Division of the Superior Court we certified the appeal on the plaintiffs' petition for certification.

I.

Before proceeding to consider the appellants' argument, it seems best to epitomize the work of the Commission on Municipal Government, familiarly known as the Faulkner Commission, and the act in question, which resulted from the labors of the commission. The commission came into existence as the result of Joint Resolution No. 1 of the New Jersey Legislature, dated February 18, 1948. The commission was charged by the Legislature with the duty of:

"* * * inquiring into the structure of local government in this State, of examining the laws governing the various forms and essential procedures of municipal government presently in operation

or available and the terms and conditions on which each such form may be adopted by the people of any community, to investigate and evaluate the actual operation of each of the several forms now in use and to obtain information concerning approved forms and practices of local government in other States, all with the view to suggesting in what respects the laws of New Jersey might be changed to provide the fullest opportunity for local self-government consistent with the interests of the State as a whole."

On November 1, 1948 the commission issued a Preliminary Statement setting forth a brief summary of its findings and recommendations. In it the commission emphasized the drastic need for reforms in the field of municipal government:

"The Commission would first emphasize the extreme confusion that exists in the municipal law and government of New Jersey today. The earliest structures of municipal government were provided by special charters adopted by the Legislature, incorporating the inhabitants of a special area as a body politic and corporate. These special charters still exist and are in effect in many municipalities to the extent that they are not in conflict with subsequent charters adopted by the municipality or with general laws. The Commission has made a diligent search for such charters; but even direct correspondence with each municipality failed to locate many of them, and all of them are so infiltrated with general law as to have long ago lost their identity. Special charters applying to the State's 253 boroughs no longer exist, since the borough law of 1897 superseded all special charters for this type of municipality. Any city, town, township, borough or village that has adopted any of the twenty municipal forms available under the law today, other than the borough form, is under the greatest uncertainty as to its full powers and duties for there is great confusion as to how far their former charters would be superseded."

Realizing that the New Jersey Constitution has no home rule provision permitting a municipality acting on its own initiative to adopt charter provisions best suited to its local needs, the commission recommended the so-called optional charter plan which permits each municipality to select on its own initiative and without subsequent legislative approval any one of several forms of municipal government previously approved by the Legislature.

This Preliminary Statement was widely circulated and publicized throughout the State for the purpose of stimu-

lating free and open discussion of the plan by the citizens of the State. A public hearing was held on December 9, 1948, and at all times the commission welcomed suggestions and criticisms of its Preliminary Statement. On February 14, 1949 the commission's Final Report was sent to the Governor. Bills based on the Final Report were introduced in the Legislature and public hearings thereon were held on March 11, 1949. After several amendments the bills were passed by both houses of the Legislature, and on June 8, 1950 the Optional Municipal Charter Law (*N. J. S. A.* 40:69A–1 *et seq.*) became effective on receiving the approval of the Governor.

The plans offered by the act are grouped in three general local government divisions—the Mayor-Council, the Council-Manager, and the Small Municipality. There are six alternative plans under the Mayor-Council Division, four under the Council-Manager Division, and four under the Small Municipality Division, or a total of 14 optional plans. There are two alternative procedures for adopting any of the optional plans. The first is through the election of a charter commission. Under this method, on a resolution of the governing body of the municipality, or on a petition of a specified percentage of the registered voters of a municipality, an election is held on the public question of whether a charter commission shall be elected "to study the charter" of the municipality "and to consider a new charter or improvements in the present charter and to make recommendations thereon," *N. J. S. A.* 40:69A–1. At the same time that the public question is presented the voters shall elect a charter commission of five members, *N. J. S. A.* 40:69A–2. If the public question is answered in the affirmative, the members of the charter commission shall hold public hearings, and shall provide generally for the widest possible public information and discussion respecting the purposes and progress of its work. It may also hold private hearings and sponsor public forums. Within nine calendar months from the date of its election the charter commission shall report its findings and recommendations to the citizens of

the municipality. The following reports and recommendations may be made:

"(a) that a referendum shall be held to submit to the qualified voters of the municipality the question of adopting one of the optional forms of government authorized in articles 3 through 16, inclusive, of this act, to be specified by the commission; or

(b) that the governing body shall petition the Legislature for the enactment of a special charter or for one or more specific amendments of or to the charter of the municipality, the test of which shall be appended to the charter commission's report pursuant to *Article* IV, *Sec.* VII, *Par.* 10, of the *Constitution of* 1947 and to the enabling legislation enacted thereunder to the extent that such legislation is not inconsistent herewith; or

(c) that the form of government of the municipality shall remain unchanged; or

(d) such other action as it may deem advisable consistent with its functions as set forth in section 1 - 7 of this article." *(N. J. S. A.* 40:69A–12)

In the event that the charter commission recommends any one of the Mayor-Council or Council-Manager plans, it may also specify that the municipal council provided for in the plan shall consist of seven or nine members instead of five, as provided in the act. If one of the small municipality plans is recommended it may specify that the council shall consist of five or seven members instead of three, as provided in the act. Where certain of the plans are recommended, the commission may within certain limits specify that the municipality be divided into three, four, five or six wards, instead of two wards as set forth in the act. If the charter commission recommends that the question of the adoption of one of the optional forms of government be submitted to the voters, it shall be submitted at the next general election or regular municipal election, or at a special election at such time as the charter commission's report shall direct. If a special charter is recommended or a special amendment or amendments to the existing charter, it is the duty of the governing body of the municipality to petition the Legislature for a special law in accordance with *Article IV, Section VII, paragraph 10* of the Constitution.

The second procedural method of adopting one of the optional plans for a charter is by petition or referendum of the voters without a charter commission. Under this method, upon receipt of a petition signed by a specified percentage of the registered voters of any municipality, the municipal clerk shall arrange for an election on the question of the adoption of the optional plan designated in the petition. The petition shall be voted on at the next general or regular municipal election, if one is held not less than 60 days nor more than 120 days after the filing of the petition, otherwise at a special election within such time.

After the voters of a municipality have adopted an optional form of government under this act, the question of adopting a different form of government cannot be voted on until three years thereafter in the case of municipalities of 7,000 or less inhabitants and five years thereafter in the case of all other municipalities.

The act provides that general laws applicable to all municipalities and also certain other laws specified therein shall at all times be applicable to the new municipal government. A liberal construction of the provisions of the act is prescribed:

"The general grant of municipal power contained in this article is intended to confer the greatest power of local self-government consistent with the Constitution of this State. Any specific enumeration of municipal powers contained in this act or in any other general law shall not be construed in any way to limit the general description of power contained in this article, and any such specifically enumerated municipal powers shall be construed as in addition and supplementary to the powers conferred in general terms by this article. All grants of municipal power to municipalities governed by an optional plan under this act, whether in the form of specific enumeration or general terms, shall be liberally construed, as required by the Constitution of this State, in favor of the municipality." (*N. J. S. A.* 40:69A–30)

## II.

1. The plaintiffs' first attack on the constitutionality of the act is aimed at the alleged independent will interposed between the Legislature and the voters in the form of the

charter commission. It is claimed that the charter commission represents an illegal go-between, to whom the Legislature has made an unconstitutional delegation of its authority in violation of *Article IV, Section I, paragraph 1* of the *New Jersey Constitution* which ordains that "The legislative power shall be vested in a senate and general assembly."

It is, of course, well settled that if the Legislature had submitted this election of a plan directly to the voters of the municipality its action would be constitutional, *City of Paterson v. Society of Establishing Useful Manufactures*, 24 *N. J. L.* 385 (*Sup. Ct.* 1854); *In re Cleveland*, 52 *N. J. L.* 188, 190 (*E. & A.* 1889). But the plaintiffs assert that this cannot constitutionally be done where an intervening will is placed between the Legislature and the voters, citing in support thereof *Attorney-General v. McGuinness*, 78 *N. J. L.* 346 (*E. & A.* 1910) and *McCarthy v. Walter*, 108 *N. J. L.* 282 (*E. & A.* 1931). These cases, however, are clearly distinguishable. In the *McGuinness* case the statute provided that the Civil Service Law should become operative upon its adoption by the governing body of the municipality and the voters were given no voice in the matter. In the *McCarthy* case the Park Act, by its very terms, was not to be submitted to the voters unless the board of chosen freeholders in its absolute discretion decided to present the question to them. In neither case did the voters themselves have the right to decide to accept or reject the act in question. They were at the mercy of an independent will.

This is far different from the situation under the Faulkner Act, where first of all the voters always have the alternative procedural method of petition and referendum whereby they can compel the question of acceptance of one of the 14 plans to be placed on the ballot. Thus the fact that the charter commission may recommend no plan at all does not frustrate their efforts at changing their form of government, for they can still bring the plan they prefer to a vote by petition under the act's alternative procedural method. Secondly, no matter by which method the question is submitted to the voters, whether through the instru-

mentality of the charter commission or by petition and referendum, the optional plan of government becomes effective only through its adoption by the electorate. The charter commission has no power to legislate. The act sets up 14 plans, each complete in itself. The commission can only study the various plans and then report its recommendations to the people. The function of the commissioners is purely that of selection and recommendation, not of legislation or adoption.

The charter commission is vested with no powers of government. It cannot impose its will upon the people. Its findings and recommendations have none of the force of legislation. The adoption of a plan rests entirely in the hands of the voters. The members of the charter commission are their agents, chosen because of their ability to aid in the selection of a desirable plan of municipal government. If the voters are dissatisfied with the recommendation of the charter commission, they can vote it down and use the alternative method of petition and referendum for effectuating their wishes:

"It would seem, however, that the charter commission being specially elected by the people for the purpose of making this preliminary choice and providing for the submission of the question of ultimate adoption, does not in any sense constitute an act which intervenes between the will of the people and the will of the Legislature, but is rather a means of expressing the will of the people by preliminary referendum.

The charter commission device thus provides, within the limits of the present constitution, for an orderly study of local needs by specially elected local people, and for the acceptance or rejection by the voters themselves of the recommendations of the commission." (*Commission on Municipal Government, Preliminary Statement, p.* 21 1948).

There has been no unconstitutional delegation of legislative powers.

2. Our Constitution prohibits the legislative branch from adopting a private, special or local law regulating the internal affairs of municipalities, except upon petition therefor by the governing body of the municipality and then only upon a

two-thirds vote of all the members of each house, *Article* IV, *Section* VII, *paragraph* 9. The plaintiffs contend that the Faulkner Act violates this provision since a special and local law for Hoboken may be adopted without using the procedure required by the Constitution. This argument overlooks the meaning of the words special and local. In *Van Riper v. Parsons*, 40 *N. J. L.* 1, 8 (*Sup. Ct.* 1878), Chief Justice Beasley said:

"Upon the face of this law, therefore, the repealer is general, and the substitution of other agencies is equally so.

But it is said that, although such is the frame and aspect of this statute, still it must be regarded as local and special, as of necessity it can be applicable to but a few places of the state, inasmuch as it is well known that but few localities in the state have been subjected to the rule of legislative commissions. This contention assumes the truth of the hypothesis that a law that embraces but a few localities, or a small number of objects, is not a general, but a special or local law. But I think there is a mistake in this. The terms 'general law' do not import universality in the subjects or operation of such law. The constitutional clause in question calls for the enactment, in this particular field of legislation, of general acts, but such so-called general acts are, for the most part, special and local in their effect and applicability, provided we put the widest possible signification on the terms special and local. But these two latter terms do not carry with them such a compass of meaning as this, as they stand in the clause of the constitution now under consideration. If such were their scope, they would render almost every attempt at useful legislation abortive."

See *In re Cleveland, supra*, 52 *N. J. L.* 188, 191 (*E. & A.* 1889); *Warner v. Hoagland*, 51 *N. J. L.* 62, 72 (*Sup. Ct.* 1888).

For years the Legislature has exercised its right to offer to municipalities, through a great number and variety of general laws, various forms of local government that could be adopted by them by referendum. Such a practice has always been upheld against the charge of unconstitutionality for violating the provision of our Constitution against special and local laws. The purpose of the constitutional provision against special and local laws was to put an end to the undesirable practice whereby a municipality was governed

by a law applicable to it alone, enacted by persons having no particular interest in the locality and having no constituency living within its bounds to whom they were accountable for sanction. *Van Riper v. Parsons, supra*, 40 *N. J. L.* 1 (*Sup. Ct.* 1878). In the light of the well reasoned decisions construing this clause of the Constitution, which have stood the test of time, there is obviously no merit to this suggested constitutional objection. The optional plans under the Faulkner Act are available to all municipalities in general. The fact that the voters of all municipalities do not adopt the same plan does not mean that a special or local law has been enacted in each case. The Legislature has enacted a general law. The action taken by the people under it through their votes and their charter commissions in no way affects the general character of the law.

3. The plaintiffs refer to Article IV, Section VII, paragraph 4 of the New Jersey Constitution which provides:

"To avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title."

This provision, they contend, has been violated in the title of the Faulkner Act—"An Act concerning municipalities, providing a plan of optional charters and for the manner of adoption and effect thereof,"—which they allege is uncertain, deceptive and misleading, and contains more than one object.

There is no substance to this argument. The provisions of the act to which objection is made are merely features thereof necessary and appropriate to the fulfillment of the legislative intent. Thus, the plaintiffs mention the three or five year freeze period, the power of the charter commission to select the single plan to be submitted to the people, its power to change the number of wards in a municipality, the replacement of the Walsh Act, and the like. None of these provisions violates this section of the Constitution. In *Public Service Electric and Gas Company v. Camden*, 118 *N. J. L.* 245, 248 (*Sup. Ct.* 1937), the constitutionality of a statute

entitled "An Act concerning municipalities," commonly referred to as the Home Rule Act, was upheld in an opinion in which Mr. Justice Heher summarized the New Jersey decisions on this point, saying:

"The title of a statute gives expression to its object, in the constitutional sense, 'if it contain a mention of the subject-matter generally, together with a succinct indication of the legislation respecting it.' *Mortland v. Christian*, 52 *N. J. L.* 521, 537. The 'object' of a law is not to be confused with its 'product.' It is not requisite that the title be an abstract or synopsis of the contents of the statute. [Citing cases.] The title is a label, not an index. * * *

If the 'leading' or general subject of a statute is fairly expressed in the title, the constitutional requirement is met [citing cases]. * * *

Where the subject of legislation is single, and is of a general character, all matters reasonably connected therewith, and appropriate to the achievement of the legislative object, may be embraced therein without infringing the constitutional interdict; and, by the same token, matters cognate to that object are not required to be expressly mentioned in the title. The title comprehends, within the signification of this constitutional provision, all matters embodied in the statute germane to the subject of the title, and not excluded thereby."

Even more pertinent is his opinion in *Jersey City v. Martin*, 126 *N. J. L.* 353, 363 (*E. & A.* 1941):

"If the 'leading' or general subject of a statute is fairly expressed in the title, the constitutional mandate is satisfied. The 'object' of a law is not to be confused with its 'product.' The product may be 'as diverse as the object requires and finds its expression in the terms of the enactment only.' *Moore v. Burdett*, 62 *N. J. L.* 163. * * * The criterion is whether the title is such that thereby the members of the legislature are given notice of the subject to which the act relates, and the public informed of the kind of legislation that is under consideration. And it is the settled rule that a statute will not be judicially declared inoperative and unenforceable on this ground unless it is palpably in contravention of the constitutional command. *Public Service Electric, &c., Co. v. Camden, supra.*"

The general purpose of the act is clear. The title is in no way misleading or deceptive. In fact, few acts have been so closely scrutinized and subject to so much study by the Legislature and the public. The act, and of course the

title thereof, embrace but one general purpose, the presentation of optional charter plans to the voters of the various municipalities. All provisions of the act are in furtherance of this purpose. The title of a statute is a label, not an index. It is unnecessary and in fact undesirable for a title to give a resumé of the provisions of the act. The constitutional provision is. complied with when the title gives notice to the Legislature and the public of the general purpose of the act. Our courts have unhesitatingly given their sanction to titles of acts which contained very broad grants of powers to municipalities, *Public Service Electric & Gas Co. v. Camden, supra.* Many of our statutes possess very broad titles. Thus the Corporation Act of 1896 entitled "An Act Concerning Corporations" provides for the creation, management, merger, consolidation, dissolutions of all forms of corporate activity in the State, and "An Act to Regulate Elections" sets forth the numerous provisions that govern the conduct of all state and municipal elections.

There is no violation of *Article IV, Section VII, paragraph 4* of the *New Jersey Constitution.*

4. The plaintiffs next attack the so-called freeze period of the statute:

"The voters of any municipality which has adopted an optional form of government pursuant to this act may not vote on the question of adopting another form of government until three years thereafter, in the case of municipalities of 7,000 or less inhabitants, and five years thereafter in the case of all other municipalities." *N. J. S. A.* 40:69A–23

They claim this provision is unconstitutional because (1) it prohibits the people of a municipality from altering their form of government whenever the public good may require it in violation of *Article I; paragraph 2* of the *New Jersey Constitution,* and (2) because it unfairly discriminates among municipalities on the basis of population alone, although population bears no logical or reasonable relation to the subject of change in form of government, in violation of *Article I, paragraphs 1* and *21,* and *Article IV, Section VII, paragraphs 7* and *9 (13)* of the *New Jersey Constitution,* as well

as the Fourteenth Amendment of the United States Constitution.

 *Article I, paragraph 2*, of our *Constitution* provides: "All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people, and they have the right at all times to alter or reform the same, whenever the public good may require it." The difficulty with the plaintiffs' argument in this respect is that this section of the Constitution does not apply to local government, but rather to the State Government only. In New Jersey local government has always been a creation of the Legislature. The people have no inherent right of local self-government beyond the control of the State. *Attorney General v. McGuinness*, 78 *N. J. L.* 346 (*E. & A.* 1910); *Jersey City v. Martin*, 126 *N. J. L.* 353, 361 (*E. & A.* 1941). *Trenton v. New Jersey*, 262 *U. S.* 182, 187, 43 *S. Ct.* 534, 67 *L. Ed.* 937, 942 (1923). In view of the unquestioned legislative control of local government, there can be no doubt that in a proper case there can be a valid classification based upon population where population bears a reasonable relation to the necessities and proprieties of the various kinds of municipal government. *Lewis v. Jersey City*, 66 *N. J. L.* 582, 587 (*E. & A.* 1901); *Koons v. Atlantic City*, 134 *N. J. L.* 329, 333 (*Sup. Ct.* 1946), affirmed 135 *N. J. L.* 204 (*E. & A.* 1947).

 Plaintiffs contend, however, that the classification here bears no such reasonable relation, relying upon *Lowthorp v. Trenton*, 62 *N. J. L.* 795 (*E. & A.* 1898), and *Koons v. Atlantic City, supra*. In the *Lowthorp* case the Legislature passed an act providing for the purchase of lands and the construction and repair of buildings for high school purposes for cities of the second class only. The court held the act unconstitutional since the purchase, construction and maintenance of school property by a municipality has no relation whatever to the governmental apparatus of such a municipality, and a classification on the basis of population for such a purpose is entirely without legal justification. Clearly there the population had nothing to do with the con-

struction and repair of school buildings. In the *Koons* case a special grant of a taxing power was confined to the Atlantic Ocean resort cities having a population exceeding 50,000 inhabitants; since Atlantic City was clearly the only municipality within this grouping the act was held unconstitutional in view of the "unreal and illusive" classification. The pertinency of these cases does not appear.

More to the point is *Mortland v. Christian*, 52 *N. J. L.* 521 (*E. & A.* 1890), where a statute was enacted to substitute a board of chosen freeholders elected by assembly districts for a board elected by townships and wards in counties of the first class, *i. e.*, Essex and Hudson Counties. In upholding the constitutionality of the act Mr. Justice Garrison stated at *page 537*:

"The act in question regulates the internal affairs of counties, and hence is unconstitutional if it be local or special. The act purports to operate upon a class of counties generally, viz., those having a population of one hundred and fifty thousand and upwards. Hence, if the legislative object be one for the imposition of which population affords a proper basis, the act is general, without regard to the number of counties to be affected by its operation, or to the wisdom or unwisdom of applying its provisions to the counties so selected. From this brief statement of the principle adopted by the courts of this state in dealing with the constitutionality of laws claiming to be general, it is evident that the controlling question in each case is whether the provisions of the act are such as are germane to population. The act under review concerns the machinery for the administration of county affairs. The class of counties selected are those having the largest population. If the provisions of the act are such that they would be equally appropriate to the other counties of the state, then the classification adopted is illusory, not real, and the legislation is special, although sounding in general terms. It is necessary, therefore, to look at the provisions of the act somewhat in detail, not for the purpose of passing upon their merits or demerits, but in order to ascertain whether their substantial features, while applicable to larger counties, are inapplicable to the smaller ones. * * *

The legislature, in whom the determination of these questions is vested by the constitution, has decided that counties of the first class do require a change of the character indicated by this act, which changes, from the considerations just mentioned, are inappropriate to the smaller counties for the same reasons which constitute their appropriateness to the larger ones. Such being the relation borne by the provisions of this act to the various counties

of this state, viewed from the standpoint of population, the act in question must be deemed to be general in that it reaches the one class to which the legislature has determined that it is appropriate, and that that class is distinguished by those features which constitute its appropriateness from all the other counties in the state."

In *Foley v. Hoboken*, 61 *N. J. L.* 478 (*Sup. Ct.* 1898), the same judge drew a distinction between legislation which affects the structure or machinery of local government and that which "operates upon the inhabitants or taxpayers in other respects," but stated that in either case the test was whether the classification was substantial or illusive. Illusiveness, he declared, "results equally when a classification is created with a view of escaping the constitutional restriction and when one is adopted with a like result." Mr. Justice Van Syckel in his opinion for the court in *Paul v. Gloucester County*, 50 *N. J. L.* 585, 592 (*E. & A.* 1888), stated:

"Whether the basis of classification is wise or judicious, or whether it will operate as fairly as some other basis that might be adopted, is a question for the legislature, and not for the courts. The extreme limit of our inquiry in this direction is, Does population bear any reasonable relation to the subject to which the legislature has applied it; is it germane to the law?"

As stated in *Anderson v. City of Trenton*, 42 *N. J. L.* 486, 488 (*Sup. Ct.* 1880): "The question to be determined concerning the law now under review, therefore, is whether, since it does not relate to all cities, it affects a class of cities constituted upon this principle—whether the basis of classification is some peculiar feature to which the provisions of the law are naturally related." See *Wanser v. Hoos*, 60 *N. J. L.* 482 (*E. & A.* 1897).

In the light of these cases we see no merit to plaintiffs' contention. The Legislature has determined that as far as this freeze period is concerned a distinction should be made between the municipalities with less than 7,000 inhabitants and those with an excess thereof. Plaintiffs have not convinced us that this distinction is arbitrary and without reasonable basis. A larger municipality needs a longer test period in which to study the operation and effect of its new

plan. The problems of city government are naturally more complex than those of the smaller community, and it may be unwise to condemn a plan of government before it has been in effect for this longer period of time. Also there is necessarily a great amount of confusion attendant upon a change of government in the larger municipality. Such disorder should be kept at a minimum by requiring longer periods of time between changes of government.

The classification is valid.

5. Finally, the plaintiffs contend that sections 26 and 28 of the Faulkner Act violate the New Jersey constitutional requirement that:

"No act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of the act or which shall enact that any existing law, or any part thereof, shall be applicable, except by inserting it in such act." *Art. IV, Sec. VII, par. 5.*

These sections are as follows:

"40:69A–26. Upon the adoption by the qualified voters of any municipality of any of the optional forms of government set forth in this act, the municipality shall thereafter be governed by the plan adopted, by the provisions of this act common to optional plans and by all applicable provisions of general law, subject to the transitional provisions of article 17 of this act, unless and until the municipality should adopt another form of government as provided by law."

"40:69A–28. For the purposes of this act, a 'general law' shall be deemed to be any law or provision of law, not inconsistent with this act, heretofore or hereafter enacted which is by its terms applicable or available to all municipalities, and the following additional laws whether or not such additional laws are so applicable or available to all municipalities; legislation relating to taxation, local courts, education, health, public authorities serving more than one municipality, and municipalities in unsound financial condition."

Their argument is that by the words in section 28, "whether or not such additional laws are so applicable or available to all municipalities," the Legislature has incorporated into the Faulkner Act, which is applicable to all municipalities, prior statutes which when enacted were not applicable to all classes of municipalities. This contention rests on an erro-

neous interpretation of these words. Section 28 merely provides that two kinds of general laws shall still be applicable to municipalities that adopt a charter under the Faulkner Act, notwithstanding such action. First are those general laws applicable to all municipalities no matter what their class may be. Second are those laws which, although they cover the class in which the particular municipality falls, do not refer to all municipalities generally.

Such provisions are clearly valid. In *Jersey City v. Martin*, 127 *N. J. L.* 18, 23 (*E. & A.* 1940) it was stated:

"The cited constitutional provision interdicts the incorporation in a legislative enactment, by mere reference, of 'any existing law, or any part thereof.' This constitutes a limitation upon the exercise of the legislative power, and it is for that reason to be strictly construed. It concerns rights created and duties and burdens laid or imposed rather ·than their enforcement. If the reference is not to 'affect or qualify the substance of the legislation or vary the terms of the act,' but is 'merely for the formal execution of the law,' it is not within the prohibition. The design of the limitation was 'the suppression of deceptive and fraudulent legislation, the purpose and meaning of which could not be discovered either by the legislature or the public without an examination of and a comparison with other statutes.' The intention was not 'to obstruct or embarrass legislation,' but 'to secure a fair and intelligent exercise of the lawmaking power.' *Campbell v. Board of Pharmacy of New Jersey*, 45 *N. J. L.* 241; affirmed, 47 *Id.* 347; *Evernham v. Hulit*, 45 *Id.* 53; *Christie v. Bayonne*, 48 *Id.* 407. If the statute embody 'a complete and perfect act of legislation in itself,' it may provide for 'ancillary proceedings to accomplish the purposes expressed in the act, by a reference to general laws on the subject, without violating this constitutional provision.' *DeCamp v. ·Hibernia Railroad Co.*, 47 *Id.* 43." ·

To the same effect is *Township of Landis v. Division of Tax Appeals*, 137 *N. J. L.* 224, 228 (*E. & A.* 1948). These provisions are merely non-repealers. They in no way concern rights created or duties and burdens imposed.

The judgment below is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For reversal*—None.