FRANK H. EGGERS, PLAINTIFF-APPELLANT, v. JOHN V. KENNY, DONALD SPENCE AND BERNARD J. BERRY, CONSTITUTING A COMMITTEE OF THE BOARD OF COMMISSIONERS OF THE CITY OF JERSEY CITY, DEFENDANTS-RESPONDENTS.

Argued February 8, 1954—Reargued February 23, 1954—Decided March 29, 1954.

*Mr. Frank G. Schlosser* argued the cause for the appellant (*Mr. Jeremiah J. O'Callaghan,* attorney).

*Mr. Ralph P. Messano* argued the cause for the respondents (*Mr. John B. Graf,* attorney).

The opinion of the court was delivered by

JACOBS, J.   The plaintiff appealed to the Appellate Division from an order entered in the Law Division of the Superior Court denying his application to stay a subpoena issued by a committee of the Board of Commissioners of Jersey City.   We certified his appeal on our own motion. See *R. R.* 1:10–1.

On August 18, 1953 the board of commissioners adopted a resolution which created an investigating committee to examine all municipal officers and employees "in relation to the discharge of their official duties or conduct" and to investigate "such additional subjects, persons or matters falling within" its jurisdiction as may require examination. Three city commissioners, named as defendants herein, were designated as the committee and on September 20, 1953 they served a subpoena upon the plaintiff, a fellow city commissioner.   The plaintiff appeared before the committee on September 21, 1953 and again on September 29, 1953 but testified only briefly.   On October 15, 1953 Judge Proctor found that the plaintiff had engaged in contemptuous conduct before the committee and entered an order that he refrain from such conduct.   On October 26, 1953 the committee issued a further subpoena directing the plaintiff to

appear and testify but before its return date the plaintiff instituted his action in the Law Division seeking the quashing of the subpoena and other incidental relief. His complaint charged generally that the committee was illegally created and its members "politically motivated"; that the defendants had combined to use the committee "for the unlawful purpose of defaming plaintiff"; that the statutes under which the committee acted are unconstitutional; and that the subpoena in effect restrained plaintiff "from attending to his official and political duties and affairs and is an unlawful and unwarranted invasion of his rights." The plaintiff moved for an order staying the subpoena *pendente lite* and relied entirely upon his complaint which bore a general verification in short form and on information and belief. The motion was denied by Judge Proctor on November 23, 1953 and on the following day notice of appeal was filed. *Cf. R. R.* 2:2-3(a)(1), (4); *Salomon v. Jersey City*, 12 *N. J.* 379, 383 (1953); *Stiles v. Hammond*, 21 *N. J. Super.* 237, 239 (*App. Div.* 1952); *Warren v. Hague*, 11 *N. J. Super.* 311, 315 (*App. Div.* 1951). Each of the points urged in support of the appeal will be considered although not in the order presented by the appellant.

## I.

The plaintiff contends that the committee is investigating alleged violations of the criminal law and that under *In re Hague*, 123 *N. J. Eq.* 475 (*E. & A.* 1930) such conduct, by the Legislature or its governmental subdivisions, trespasses upon the powers of the courts and grand juries in violation of the Constitution. Legislative investigations at both federal and state levels have a long history and have been the subject of extensive research and comment. See *Eberling, Congressional Investigations* (1928); *McGeary, The Congressional Power of Investigation*, 28 *Neb. L. Review* 516 (1949); *Herwitz and Mulligan, The Legislative Investigating Committee*, 33 *Col. L. Rev.* 4 (1933); *Potts, Power of Legislative Bodies to Punish for Contempt*, 74 *U. of Pa. L.*

*Rev.* 691, 780 (1926); *Goldmann v. Schettino, The Legislature—Investigations,* 2 *Constitutional Convention of 1947,* 1549 (1951); *Note, Power of the Legislature to Punish for Contempt,* 4 *U. of Newark L. Rev.* 189 (1939). Early records of the British Parliament and the American Colonies contain instances of legislative investigations and later records of the House of Representatives and the Senate as well as state legislative bodies are replete with similar precedents. As early as 1792 the House adopted a resolution authorizing the appointment of a committee to investigate General St. Clair's conduct of military affairs and the expenditure of related appropriations. See *Landis, Constitutional Limitations on the Congressional Power of Investigation,* 40 *Harv. L. Rev.* 153, 170 (1926). And in 1818 the Senate appointed a committee with broad powers to investigate General Jackson's conduct in waging the Seminole War. In 1781 the Virginia House of Delegates authorized its standing committees "to send for persons, papers, and records for their information," and in 1824 the New York Assembly appointed a committee to discover whether the charter of the Chemical Bank had been obtained corruptly. Many other illustrations may be found in the cited texts and articles; for present purposes it is sufficient to point out that prior to 1880 legislative investigations flourished virtually without any judicial interference.

In 1881 the Supreme Court decided *Kilbourn v. Thompson,* 103 *U. S.* 168, 26 *L. Ed.* 377 (1881). The banking house of Jay Cooke & Co. was in bankruptcy and it appeared that the Secretary of the Navy had made improvident deposits of public moneys in its London branch. The House of Representatives appointed a special committee to investigate a real estate pool in which the bankrupt had been interested and a settlement which had been made, resulting in alleged loss to the Government and other creditors. During the investigation Kilbourn refused to answer questions which were propounded by the committee and his refusal was sustained by the Supreme Court. In the course of the court's opinion, Justice Miller expressed the view that

the investigation was "simply a fruitless investigation into the personal affairs of individuals" which "could result in no valid legislation on the subject." As Dean Landis has pointed out, this narrow approach ignored the broader aspects of the investigation which bore directly on the important administrative problems connected with the use and disposition of public moneys and which were intimately related to the legislative functions of the House. *Landis, supra,* 217. Cf. *Morgan, Congressional Investigations and Judicial Review*: *Kilbourn v. Thompson Revisited,* 37 *Cal. L. Rev.* 556, 559 (1949):

"* * * *Kilbourn v. Thompson* indicates a lack of understanding as to just what the legislative function is. Legislatures exist not merely to enact laws. They have the equally important function of determining that laws should not be enacted and their decisions in the performance of this latter function must in the nature of things frequently be influenced by consideration of whether or not the power to legislate exists. Yet *Kilbourn v. Thompson* would prevent the legislature from gathering the information that it believes will enable it to make such decisions, to make them intelligently, and to persuade others that such decisions are correct."

Forty-six years later the Supreme Court dispelled the doubts which *Kilbourn v. Thompson* had created with respect to the validity and breadth of the congressional investigating power. In *McGrain v. Daugherty,* 273 *U. S.* 135, 47 *S. Ct.* 319, 71 *L. Ed.* 580 (1927), the Senate directed its committee to investigate charges of maladministration in the Department of Justice. A subpoena was dishonored by Mally S. Daugherty, a brother of the Attorney-General whose conduct of the Department of Justice was being investigated. In rejecting an attack on the subpoena and the ensuing arrest the Supreme Court broadly approved the power of inquiry in aid of the legislative function. In the course of his opinion Justice Van Devanter pointed out that the power is an essential and appropriate auxiliary to the legislative function; that the administration of the Department of Justice was plainly a subject on which legislation could be had; and that it was no valid objection to the investigation "that it might possibly disclose crime or wrongdoing" on the part of

the Attorney-General. In *Opinion of the Justices*, 96 *N. H.* 530, 73 *A. 2d* 433 (1950), it was noted that while the Supreme Court in the *Kilbourn* case had questioned whether Congress could act "as the grand inquest of the nation" its views no longer represented the law, citing *McGrain v. Daugherty, supra; Sinclair v. United States*, 279 *U. S.* 263, 49 *S. Ct.* 268, 73 *L. Ed.* 692 (1929); *Id.*, 279 *U. S.* 749, 49 *S. Ct.* 471, 73 *L. Ed.* 938 (1929); *Jurney v. MacCracken*, 294 *U. S.* 125, 55 *S. Ct.* 375, 79 *L. Ed.* 802 (1935). See *Hurst, The Growth of American Law* 35 (1950). See also *Tenney v. Brandhove*, 341 *U. S.* 367, 377, 71 *S. Ct.* 783, 95 *L. Ed.* 1019, 1027 (1951), rehearing denied 342 *U. S.* 843, 72 *S. Ct.* 20, 96 *L. Ed.* 637 (1951); *Barsky v. United States*, 83 *U. S. App. D. C.* 127, 167 *F. 2d* 241 (*D. C. Cir.* 1948), *certiorari* denied 334 *U. S.* 843, 68 *S. Ct.* 1511, 92 *L. Ed.* 1767 (1948), rehearing denied 339 *U. S.* 971, 70 *S. Ct.* 1001, 94 *L. Ed.* 1379 (1950); *United States v. Josephson*, 165 *F. 2d* 82 (*C. C. A.* 2 1948), *certiorari* denied, 333 *U. S.* 838, 68 *S. Ct.* 609, 92 *L. Ed.* 1122 (1948), rehearings denied 333 *U. S.* 858, 68 *S. Ct.* 731, 92 *L. Ed.* 1138 (1948), 335 *U. S.* 899, 69 *S. Ct.* 294, 93 *L. Ed.* 434 (1948). In the *Tenney* case [341 *U. S.* 367, 71 *S. Ct.* 789] the Supreme Court recognized that legislative investigations, whether by standing or by special committees, are now "an established part of representative government." *Cf. United States v. Rumely*, 345 *U. S.* 41, 73 *S. Ct.* 543, 97 *L. Ed.* 770 (1953).

In recent times legislative and executive agencies of both the federal and state governments have been engaged in extensive investigations of crime; the contention that their activities trespass upon the constitutional functions of courts and grand juries has been summarily rejected. See *State ex rel. Hodde v. Superior Court*, 40 *Wash. 2d* 502, 244 *P. 2d* 668 (*Sup. Ct.* 1952); *In re Di Brizzi*, 303 *N. Y.* 206, 101 *N. E. 2d* 464 (*Ct. App.* 1951); *Attorney-General v. Brissenden*, 271 *Mass.* 172, 171 *N. E.* 82 (*Sup. Ct. Jud.* 1930). In *State ex rel. Hodde v. Superior Court, supra* [40 *Wash. 2d* 502, 244 *P. 2d* 673], a captain of the police department of Aberdeen was subpoenaed to testify before a committee of

the Washington State Legislative Council with respect to local crime conditions in Aberdeen. In sustaining the subpoena the Supreme Court of Washington pointed out that "even a cursory examination of the history of legislative councils and legislative committees in other states indicates that inquiry into local crime conditions is *customary* and well established as a proper function of the legislative branches of government." In *Re Di Brizzi, supra,* the New York Court of Appeals sustained the executive order which created the New York State Crime Commission; in the course of its opinion Judge Conway said [303 *N. Y.* 206, 101 *N. E.* 2d 469]:

"The fact that the Attorney-General and the members of the Crime Commission, in determining whether there exists a relationship between organized crime and units of government, may find it necessary to inquire as to whether individual crimes have been committed does not, as petitioner urges, render the investigation unconstitutional as a usurpation of the traditional province of the grand jury in each county of the State. This is a *general* investigation into *organized* crime and its relation to government. As an incident thereto, it may be that the existence of specific, individual crimes will be uncovered, but that will merely be collateral and subordinate to the main object of inquiry. The purpose of the investigation is to secure information to guide executive action, not to indict or punish any individuals. If the fact that a proposed investigation might be expected to disclose that crimes have been committed were to render such investigations unconstitutional, then few, if any, legislative or executive commissions could ever be validly created, for such commissions are not ordinarily established unless there is reason to believe that some violation of law has occurred."

See also *Attorney-General v. Brissenden, supra,* where the Supreme Judicial Court of Massachussets sustained a legislative investigation into the circumstances surrounding the award of a pension to a member of the police department of Boston, holding that the just administration of the pension system related to the public interest and that power to investigate it was to be implied as part of the legislative function; the court noted that although the matter bore some resemblance to an investigation by a grand jury, that circumstance must be treated "as an incident and not an end." [271 *Mass.* 172, 171 *N. E.* 86.]

In United States v. Orman, 207 *F. 2d* 148 (*C. C. A.* 3 1953), the court recently sustained a contempt conviction for refusal to testify before a subcommittee of the United States Senate's Special Committee to Investigate Organized Crime in Interstate Commerce, more popularly known as the Kefauver Committee. *Cf. United States v. Costello, 198 F. 2d* 200 (*C. C. A.* 2 1952), *certiorari* denied, 344 *U. S.* 874, 73 *S. Ct.* 166, 97 *L. Ed.* 677 (1952), rehearing denied, 344 *U. S.* 900, 73 *S. Ct.* 274, 97 *L. Ed.* 696 (1952); *Aiuppa v. United States, 201 F. 2d* 287 (*C. C. A.* 6 1952). See *The Kefauver Committee Report on Organized Crime* (1951); *Kefauver, Crime in America* (1951). The report of the American Bar Association Commission on Organized Crime, 76 *Reports of A. B. A.* 385, 420 (1951), recommended that an official crime commission be apopinted in each of the states and thereafter the National Conference of Commissioners on Uniform State Laws submitted a Model Crime Investigating Commission Act. See *Handbook of the National Conference of Commissioners on Uniform State Laws* 242 (1952). On January 8, 1952 Governor Driscoll recommended the establishment of a New Jersey Law Enforcement Council and the Legislature created it in *L.* 1952, *c.* 253. See *L.* 1953, *c.* 182; *N. J. S. A.* 52:17B–43.1 *et seq.* The Council was authorized, among other matters, to examine into the enforcement of the criminal laws and report to the Governor, the Attorney-General and the Legislature. The statute provided that every witness shall have the right to counsel for the purpose of advising him concerning his constitutional rights and that the names of witnesses at private hearings may not be divulged except by resolution of a majority of the members of the Council. Undoubtedly these provisions were designed to afford some measure of protection against investigatory excesses which have given much concern to persons sincerely devoted to democratic ideals. See *State ex rel. Hodde v. Superior Court, supra,* where Justice Finley, while sustaining the legislative investigation before him, pointed out that "recent developments in the field of legislative investigation could set at naught

the protections and safeguards of individual rights, so laboriously staked out over the centuries in the judicial field of activity." *Cf. Garrison, Congressional Investigations,* 40 *A. B. A. J.* 125 (1954); *Horack, Congressional Investigations,* 40 *A. B. A. J.* 191 (1954). Proposed codes of fair procedure for legislative investigatory committees are now receiving increased consideration from citizens seeking to attain the high goal of legislative committees operating effectively with due and just regard for the important interests of both society and the individuals affected. See *Code of Fair Procedure for Investigating Agencies, N. Y. Times,* March 9, 1954, p. 18; *Wyzanski, Standards for Congressional Investigations,* 3 *The Record* 93 (1948); *Ford, The Lawyer and the Congressional Investigation,* 21 *So. Cal. L. Rev.* 242 (1948); 29 *N. Y. U. L. Rev.* 73 (1954); 47 *Col. L. Rev.* 416 (1947).

As elsewhere, we in New Jersey have recognized the need and validity of investigations designed to facilitate the proper exercise of the legislative function. In *State v. Brewster,* 89 *N. J. L.* 658 *(E. & A.* 1916), the Legislature authorized its committee to investigate the expenditure of state moneys with particular reference to the departments of education, public roads and charities and corrections. A witness who had declined to honor a subpoena issued by the committee, was indicted, convicted, *(R. S.* 52:13–3) and duly appealed. The Court of Errors and Appeals in a unanimous opinion sustained the conviction. In the first *Hague* case *(In re Hague,* 104 *N. J. Eq.* 31, 45 *(Ch.* 1929)) Vice-Chancellor Fallon, while invalidating a legislative investigation under a joint resolution, acknowledged that the Senate and General Assembly "may respectively appoint a committee which, when so appointed, may investigate matters, within the scope of legitimate inquiry, for the purpose of acquiring information for proposed legislation." The vice-chancellor's action was affirmed because of an equally divided vote although all of the members of the court agreed that the joint resolution under which the investigation was being conducted, taken as a whole, was a valid exercise of legislative power even though

some one or more of the inquiries suggested therein might be unlawful. *In re Hague,* 104 *N. J. Eq.* 369 (*E. & A.* 1929).

In the second *Hague* case (105 *N. J. Eq.* 134 (*Ch.* 1929), affirmed 9 *N. J. Misc.* 89, 123 *N. J. Eq.* 475 (*E. & A.* 1930)) the court dealt with a supplemental legislative resolution which appointed a joint committee " 'to investigate violations of law and the conduct of any State, county or municipal official, State, county or municipal department, State, county or municipal commission, State, county or municipal board, or State, county or municipal body, to report whether the functions of such officials, departments, commissions, board and bodies have been or are being lawfully and properly discharged for the purpose of obtaining information relative thereto as a basis for such legislative action as the Senate and General Assembly may deem necessary and proper.' " The Court of Errors and Appeals struck down the investigation and expressed the sweeping view that "investigations of alleged violations of the criminal law are strictly judicial in their nature, and under the Constitution the Legislature has no more power to conduct such investigations than has the Governor, who constitutes the third branch of our governmental system, even if the latter desired the information sought for the purpose of advising the Legislature with relation to changes in our criminal laws that would make violations thereof by county and municipal officers less likely to occur." This view was contrary to *McGrain v. Daugherty, supra* [273 *U. S.* 135, 47 *S. Ct.* 329], where the Supreme Court had sustained the congressional investigation into maladministration of the Attorney-General's Office and had aptly pointed out that "a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it." It is significant that although the opinion of the Court of Errors and Appeals in the second *Hague* case cited *Kilbourn v.*

*Thompson, supra,* it failed to cite *McGrain v. Daugherty, supra,* which had greatly limited its force. Since then the many pertinent decisions which have been rendered throughout the country have recognized that if the legislative and executive branches of government are to discharge their obligation of meeting fully the threat of widespread crime they must be furnished with adequate information on the subject; it is when they know of existing conditions including the nature of the violations and the extent of official participation therein that they can best determine what legislative and executive steps should be taken for the protection of the public.

■ ■ The disastrous effects of the ruling in the second *Hague* case were well illustrated in a later decision which adhered to it. See *McRell v. Kelly,* 124 *N. J. Eq.* 350 (*E. ℓ A.* 1938), affirming *In re Kelly,* 123 *N. J. Eq.* 489 (*Ch.* 1938); *Note, Correction of Election Frauds,* 48 *Yale L. J.* 1434 (1939). There the House of Assembly appointed a committee to investigate the conduct of elections, to ascertain the duties of election officials and whether they have been properly discharged, and to report its findings as a basis for such future legislation as may be deemed necessary and proper. It is difficult to imagine anything more appropriate within our constitutional scheme of things than a legislative inquiry designed to ascertain the manner in which elections are being conducted with a view towards legislation calculated to insure fair and honest polls. Nevertheless, the Court of Errors and Appeals, on the authority of the second *Hague* case, sustained a refusal of election officials to answer preliminary questions as to their official positions. This case, as well as the pertinent holding in the second *Hague* case, must now be overruled in order that our State may have the important public benefits of the doctrine that a legislative body may conduct an inquiry in aid of its proper legislative functions even though the subject of the inquiry may also be the proper concern of courts and grand juries in their enforcement of the criminal laws. This doctrine has received almost universal recognition and is applicable equally to state

investigating committees and municipal investigating committees acting pursuant to express or implied statutory authority. *Cf. Herlands v. Surpless,* 258 *App. Div.* 275, 16 *N. Y. S.* 2d 454 (*App. Div.* 1939), affirmed 282 *N. Y.* 647, 26 *N. E.* 2d 800 (1940); *Frank v. Balog,* 189 *Misc.* 1016, 73 *N. Y. S.* 2d 285 (*Sup. Ct.* 1947), affirmed 272 *App. Div.* 941, 72 *N. Y. S.* 2d 75 (*App. Div.* 1947), leave to appeal denied, 297 *N. Y.* 1034, 75 *N. E.* 2d 275 (*Ct. App.* 1947); *State ex rel Holloway v. Rhodes,* 35 *N. E.* 2d 987 (*Ohio Ct. App.* 1940); *Leahy v. City of Knoxville,* 193 *Tenn.* 242, 245 *S. W.* 2d 772 (*Sup. Ct.* 1951); 4 *McQuillin, Municipal Corporations* (3d ed. 1949), § 13.05. We have no hesitancy in rejecting the plaintiff's contention to the effect that the investigation seeks to disclose violations of the criminal law and therefore unconstitutionally infringes upon the powers of the judicial branch of the government.

## II.

■ The next contention advanced by the plaintiff is that his position as city commissioner renders him immune from interrogation by his fellow commissioners sitting as a committee. Although the subject has been mentioned in the briefs we need not concern ourselves with the extent of the freedom from legislative investigations afforded to the executive branch of government under the doctrine of separation of powers. See *Corwin, The President* 136 (3d ed. 1948); *Opinion of Attorney General Robert H. Jackson,* 40 *Op. Atty. Gen.* 45 (1941); *Collins, The Power of Congressional Committees of Investigation to Obtain Information from the Executive Branch,* 39 *Geo. L. J.* 563 (1951). *Cf. Thompson v. German Valley R. Co.,* 22 *N. J. Eq.* 111 (*Ch.* 1871); *City of Buffalo v. Hanna Furnace Corp.,* 305 *N. Y.* 369, 113 *N. E.* 2d 520 (*Ct. App.* 1953); *Opinion of the Justices,* 328 *Mass.* 655, 102 *N. E.* 2d 79 (*Sup. Jud. Ct.* 1951). While the separation doctrine is applicable to the Federal Government and to our State Government, it generally has no applicability to our city governments. See *Wintermute v.*

*Ellenstein,* 117 *N. J. L.* 274 (*Sup. Ct.* 1936); *La Guardia v. Smith,* 288 *N. Y.* 1, 41 *N. E.* 2d 153 (*Ct. App.* 1942); 42 *Col. L. Rev.* 1217 (1942). In the *Wintermute* case a resolution was adopted designating four members of the Newark City Commission as a committee to examine "all officials, officers and employees of the City of Newark, in relation to the discharge of his or their official duties" and to examine such additional matters falling within the Commission's jurisdiction as the committee considers necessary. The committee subpoenaed the deputy director of the department of parks and public property who refused to appear and testify. The former Supreme Court upheld the validity of the investigation and the subpoena, pointing out that " 'administrative, judicial and legislative powers' " are vested in the commission and that "there is no separation of these powers as under the State Constitution setting up a form of government." See *R. S.* 40:72–4. Further in its opinion the court noted that the examination of municipal officers and employees in relation to the performance of their official duties was clearly a legitimate exercise of power vested in the commission under the governing statute and that such examination is "absolutely necessary if the city commissioners are to efficiently and economically conduct the public business as required by law."

*R. S.* 40:48–25 provides that when the governing body of a municipality appoints a committee of its members upon any subject or matter within its jurisdiction, the committee may issue a subpoena "to any person within this state." The statutory language is comprehensive and clear and nothing in it suggests the exclusion of a city commissioner from its orbit. It is true that in the *Wintermute* case the person subpoenaed was not a commissioner but his deputy; we fail to see the materiality of this factual distinction. In the *La Guardia* case the person subpoenaed by a committee of the Council of the City of New York was the mayor and the contention was advanced that he was immune therefrom under the separation of powers doctrine. In rejecting this position

the Court of Appeals made the following comments which are entirely apt:

"It is thus seen that, unlike the office of President under the federal system, the powers of the office of Mayor of the city of New York are not exclusively executive. And unlike the federal system, which recognizes a separation of powers into three independent branches, the chartered plan of government for the city of New York has but two branches—executive and legislative—the functions of which, as defined by the Legislature, are not always independent. This comes about, as we have seen, from the fact that a city is not sovereign, as are the federal government and the states. 'A municipal corporation is, so far as its purely municipal relations are concerned, simply an agency of the state for conducting the affairs of government, and as such it is subject to the control of the legislature.' *Williams v. Eggleston, supra,* 170 *U. S.* [304] at *page* 310, 18 *S. Ct.* [617] at *page* 619, 42 *L. Ed.* 1047. 'In the absence of express restrictions placed by the Constitution upon the exercise of its legislative powers, the Legislature may create or destroy, enlarge or restrict, combine or divide, municipal corporations.' *City of New York v. Village of Lawrence, supra,* 250 *N. Y.* [429] at *page* 437, 165 *N. E.* [836] at *page* 838.

It is for that reason that the theory of co-ordinate, independent branches of government has been generally held to apply to the national system and to the states but not to the government of cities. *State ex rel Wilkinson v. Lane,* 181 *Ala.* 646, 658, 62 *So.* 31; *Uridias v. Morrill,* 22 *Cal.* 473, 478; *Kaufman v. City of Tallahassee,* 84 *Fla.* 634, 639, 94 *So.* 697, 30 *A. L. R.* 471; *Ford v. Mayor & Council of Brunswick,* 134 *Ga.* 820, 68 *S. E.* 733; *Sarlls v. State ex rel. Trimble,* 201 *Ind.* 88, 115, 166 *N. E.* 270, 67 *A. L. R.* 718; *Eckerson v. City of Des Moines,* 137 *Iowa* 452, 461–466, 115 *N. W.* 177; *Bryan v. Voss,* 143 *Ky.* 422, 427, 136 *S. W.* 884; *State ex rel. Simpson v. City of Mankato,* 117 *Minn.* 458, 467–469, 136 *N. W.* 264, 41 *L. R. A., N. S.* 111; *Barnes v. City of Kirksville,* 266 *Mo.* 270, 282, 180 *S. W.* 545, *Ann. Cas.* 1917C, 1121; *City of Greenville v. Pridmore,* 86 *S. C.* 442; 443, 68 *S. E.* 636, 138 *Am. St. Rep.* 1058; *Walker v. City of Spokane,* 62 *Wash.* 312, 324, 325, 113 *P.* 775, *Ann. Cas.* 1912C, 994." [288 *N. Y.* 1, 41 *N. E.* 2d 155.]

It is significant that although Chief Judge Lehman dissented, in the belief that under the particular terms of New York City's charter its mayor as chief executive was separate and distinct from its council as the local legislative body, he expressly acknowledged that there could be no dispute "that the Legislature may impose upon cities the commission form of government which almost completely disregards the principle of separation of powers." In the case before us we

are dealing with such commission form of government; we have no doubt that the plaintiff's contention that his position as city commissioner renders him immune from interrogation by his fellow commissioners sitting as a committee is without merit.

### III.

██ ██ The plaintiff contends that the committee was improperly organized by resolution rather·than ordinance and that the resolution was "void for vagueness, indefiniteness and uncertainty." There is no statutory requirement that a municipal investigating committee (*R. S.* 40:48–25) be created by ordinance; that being so, the resolution was sufficient. See *City of Burlington v. Dennison,* 42 *N. J. L.* 165, 166 (*E. & A.* 1880); *Fraser v. Township of Teaneck,* 1 *N. J.* 503, 507 (1949). And we find nothing persuasive in the assertion that the resolution was not sufficiently definite. In pertinent part, it authorized the examination of all municipal officers and employees "in relation to the discharge of their official duties" and the investigation of "such additional subjects, persons or matters falling within the jurisdiction" of the commission as appears necessary. Its proper public purpose and scope may be fairly understood and in form it is identical with the resolution sustained in *Wintermute v. Ellenstein, supra.* See also *Barsky v. United States, supra,* 167 *F.* 2d at *page* 247; *State v. James,* 36 *Wash.* 2d 882, 221 *P.* 2d 482, 498 (1950), *certiorari* denied, 341 *U. S.* 911, 71 *S. Ct.* 615, 95 *L. Ed.* 1348 (1951).

### IV.

██ The plaintiff attacks *L.* 1953, *c.* 38 (*N. J. S.* 2A:67A–1 *et seq.*) on the grounds that its object does not appear in its title and that it provides that existing law shall be applicable without setting it forth in full. *N. J. Const., Art.* IV, *Sec.* VII, *pars.* 4 and 5. The statute is entitled, "An Act concerning counties and municipalities in relation to certain investigations and providing that it shall

be known as the 'County and Municipal Investigations
Law.'" In its body it provides that (1) whenever a mu-
nicipal investigating committee is authorized or required to
make any investigation it may proceed in accordance with
the statute in addition to any other procedure provided by
law; (2) whenever the committee is authorized to take tes-
timony it shall have power to administer oaths and to exam-
ine witnesses subject to the penalties, provisions and limita-
tions of *chapter* 81 of *Title 2A* of the *New Jersey Statutes;*
(3) any such committee authorized by law to exercise the
power of subpoena may compel the attendance of witnesses
and the production of documents related to any matter or
subject within its powers of inquiry, and, upon dishonor of
a subpoena or in the event of contemptuous conduct by the
witness, it may apply to the Superior Court for an appro-
priate order. We find that the title was wholly adequate.
It was not necessary that it abstract the contents of the
statute; it was sufficient for it to express, as it did, its
general subject matter. See *General Public Loan Corp. v.
Director of Div. of Taxation,* 13 *N. J.* 393, 403 (1953);
*Como Farms, Inc. v. Foran,* 6 *N. J. Super.* 306, 315 (*App.
Div.* 1950); *Jersey City v. Martin,* 126 *N. J. L.* 353, 363
(*E. & A.* 1941); *Public Service Electric & Gas Co. v. City
of Camden,* 118 *N. J. L.* 245, 248 (*Sup. Ct.* 1937). We
also find that there was no violation of the constitutional
provision that no act shall provide that any existing law
shall be part thereof "except by inserting it in such act."
*N. J. Const., Art.* IV, *Sec.* VII, *par.* 5. The issue was
dealt with in *Jersey City v. Martin,* 127 *N. J. L.* 18, 23
(*E. & A.* 1940), and more recently in *Bucino v. Malone,* 12
*N. J.* 330, 349 (1953), where it was pointed out that the
design of the limitation was the suppression of deceptive and
fraudulent legislation; that its intent was not to obstruct
or embarrass legislation but to secure a fair and intelligent
exercise of the lawmaking power; and that where, as here,
the act properly embodies complete legislation in itself it may
refer to auxiliary laws on the subject without violating the
constitutional provision.

## V.

▮▮▮▮▮ Finally, it is charged that the committee is being used for political purposes by its members who have combined to defame the plaintiff and that a stay of the subpoena pending trial of these charges should have been issued. It may be assumed that where a municipal investigating body is acting in bad faith or without any legitimate public ends it will judicially be considered as exceeding its delegated statutory functions; our courts have unhesitatingly struck down arbitrary use of municipal power in innumerable fields. See *e. g., Grogan v. DeSapio*, 11 *N. J.* 308, 321 (1953); *Cassinari v. City of Union City*, 1 *N. J. Super.* 219, 222 (*App. Div.* 1949). Where, however, the committee is engaged in municipal investigation having legitimate public ends, it is immaterial that political motivation is also present; any other view would defeat the many public investigations which, while perhaps resulting in anticipated political advantage, also serve society by unearthing official misconduct with consequent corrective legislation and executive action. *Herlands v. Surpless, supra; Frank v. Balog, supra. Cf. Pellet v. Department of Civil Service*, 10 *N. J. Super.* 52, 57 (*App. Div.* 1950); *Village of Ridgewood v. Borough of Glen Rock*, 15 *N. J. Misc.* 65, 66 (*Sup. Ct.* 1936); *Eberling, supra, p.* 281. In the leading case of *Keeler v. McDonald*, 99 *N. Y.* 463, 2 *N. E.* 615, 627 (*Ct. App.* 1885), the court remarked that "Where public institutions under the control of the state are ordered to be investigated, it is generally with the view of some legislative action respecting them; and the same may be said in respect to public officers." At the present stage the committee is entitled to the benefit of the presumption of good faith which accompanies official municipal action regular on its face and within statutory authority. As was said by the Court of Appeals in *Re Joint Legislative Committee, etc.*, 285 *N. Y.* 1, 32 *N. E. 2d* 769, 771 (1941), it must be assumed that the inquiry is "well intended" and in the absence of a clear showing of illegality or futility there should be no frustration at its threshold.

*Cf. McGrain v. Daugherty, supra,* 273 *U. S.,* at *page* 175, 47 *S. Ct.,* at *page* 329, 71 *L. Ed.,* at *page* 593; *Tenney v. Brandhove, supra,* 341 *U. S.,* at *page* 378, 71 *S. Ct.,* at *page* 789, 95 *L. Ed.,* at *page* 1027.

We are not presently concerned with any issues which bear on the materiality of evidence, claim of privilege, or actual conduct of the committee's hearings; nor are we concerned with any other pending investigation (*Tiene v. Jersey City,* 13 *N. J.* 478 (1953)) into the affairs of Jersey City. See *Herlands v. Surpless, supra.* We are simply dealing with an attempt to forestall this particular public inquiry before it can get under way. Judge Proctor rejected the attempt and his action was well within his discretionary authority under *R. R.* 4:88–5. There were no proofs whatever presented to him of improper conduct on the part of any of the committee members except, perhaps, the general conclusions in the complaint. He rightly took the position that upon the showing before him the grant of permission to the investigating committee to proceed with its duties at once would be in the public interest and would not embarrass any legitimate rights of the plaintiff or others. If a later showing discloses that judicial relief should then be made available in the interests of complete justice, our court system undoubtedly will not be found wanting. *Cf. Grogan v. De-Sapio, supra; State v. Borg,* 9 *N. J. Misc.* 59 (*Sup. Ct.* 1931).

The order entered in the Law Division denying the application to stay the subpoena is affirmed.

HEHER, J. (dissenting). The power invoked by *R. S.* 40:48–25 is essentially executive or administrative rather than legislative; and the action taken must meet the test of reasonableness and be characterized by good faith. As much was freely conceded by the defendants on the oral argument and reargument of the cause. There is a suggestion that the inquiry is designed to invade the field covered by the current summary investigation into municipal affairs under *R. S.* 40:6–1, in which the city in resisting a taxpayer's

application under that statute as made in bad faith and baseless in fact, by resolution adopted by the local governing body, prayed for an "integrated investigation" of the city's affairs " 'for the entire period beginning with the year 1917,' " and was assured by Judge Proctor that the inquiry would " 'not be limited as to time, or as to any particular administration.' " *Tiene v. Jersey City*, 13 *N. J.* 478 (1953). Probes are expensive, and counter-probes may be confusing and obstructive and not in the public interest. A rival inquiry may be an abuse of the statutory power, as tending to subvert the investigative mechanism; and administrative excesses are remediable by the judicial process. The issue, involving as it does the legal existence of the defendant committee, should be determined before the exercise of the statutory power of subpoena, for on that depends the right of testimonial compulsion.

I would reverse the order under review and remand the cause with direction to stay the subpoena until the fundamental issue of factual reasonableness is adjudicated.

Mr. Justice WACHENFELD joins in this dissent.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, BURLING, JACOBS and BRENNAN—5.

*For reversal*—Justices HEHER and WACHENFELD—2.